# CHARLESTON.

STOUT v. SANDS.

| 56 663 |
| 60 459 |

| 56 | 663 |
| 165 | 247 |
| 165 | 377 |

Submitted September 10, 1904. Decided December 20, 1904.

1.  EVIDENCE—*Presumption of Fact.*
    Suppression, by one party to a suit, of a document relied upon
    as evidence by the opposite party, is not equivalent to an admis-
    sion of the truth of the claim of the latter respecting its con-
    tents, and does not dispense with the necessity of *prima facie*
    proof of such claim, sufficient to sustain a judgment or decree.
    But, when a *prima facie* case is made and doubt is cast upon it
    by rebuttal evidence or otherwise, suppression of the document
    raises a strong inference against the party failing to produce it
    and determines the point in favor of the other party. (p. 665).

2.  WITNESS—*Impeachment—Testimony.*
    Though a party cannot impeach a witness called by him, he is
    not bound by all such witness says. He may prove the material
    facts by other evidence, even though the effect of it is to directly
    .contradict his own witness; but he cannot show that the wit-
    ness has made contradictory statements out of court. (p. 668).

Appeal from Circuit Court, Harrison County.

Action by Elmore H. Stout against C. Sprigg Sands and
others. Decree for defendants, and plaintiff appeals.

*Affirmed.*

E. G. SMITH, H. W. WILLIAMS, and L. C. LAWSON, for ap-
pellant.

DAVIS & DAVIS and M. F. SNYDER, for appellees.

POFFENBARGER, PRESIDENT:

A bill and an amended bill to reform a deed, on the grounds
of mistake and fraud having been dismissed by the circuit
court of Harrison county, for want of proof of the allegations
of the bill, the plaintiff has appealed

Some time in the year 1900 the plaintiff, Elmore H. Stout,
being the owner of a tract of land, containing about two hun-
dred acres, part of which is underlaid with the Pittsburgh vein
of coal, and all of which is supposed to be underlaid with deeper
veins of coal known by other names, executed, by the procure-

ment of one Samuel W. Kinsey, an option of purchase of coal under said land in favor of C. Sprigg Sands, to be by him conveyed to certain persons who were then securing by purchase a large compact body of coal in that neighborhood, composed of the aggregate area of several farms, with a view to organizing a company to open and operate coal mines. Sands had taken options on all the desired territory except that of Stout. In view of his inability to procure it at a satisfactory price, Kinsey, who was an agent of the parties to whom it was intended Sands should convey the land, was sent to Stout for the purpose of securing an option. He succeeded in doing so at the price of $40.00 per acre, delivered it to Sands, caused the Pittsburgh vein of coal to be surveyed, and later a deed, bearing date October 27, 1900, prepared at the instance of Sands, was presented to Stout and his wife for execution at the bank of which Sands was Cashier, which they executed, under the belief that it conveyed only the Pittsburgh vein of coal, but which in fact included by its terms all the coal under the land. Having discovered this later, Stout commenced this suit for reformation on the 17th day of September, 1901. Meantime, Sands had conveyed the coal to James T. Blair and Cyrus T. Achre, trustees, by deed, dated November 13, 1900, who, by deed, dated February 20, 1901, conveyed it, together with all the other coal secured and conveyed to them by Sands, to a corporation, called the Interstate Coal Company, and that company, by deed, dated September 11, 1901, conveyed it to another corporation, called The Clarksburg Fuel Company. To the first bill, which was filed at November rules, 1901, Sands, Blair and Achre, trustees, and the Interstate Coal Company were made defendants. On the 4th day of April, 1902, an amended bill was filed in court, making the Clarksburg Fuel Company a defendant. On the 5th and 7th days of June, 1902, respectively, Sands and the Clarksburg Fuel Company answered. Sands having died, the cause was revived against his executrix and devisee in September, 1903. A number of depositions were taken and filed by the plaintiff, but none by the defendants. At the May term, 1904, the Interstate Coal Company answered, and, on the 4th day of June, 1904, the decree complained of was entered.

Competent witnesses prove that there was a preliminary optional contract between Stout and Sands, embodying the terms upon which the conveyance was to be made. Kinsey swears he

wrote it .and Stout's son swears he was present and heard the negotiations, saw the contract signed, read it, and signed it himself as a witness. Kinsey further swears that he delivered it to Sands and that he knows nothing of its whereabouts, but supposes it is with Sands' papers. The bill and amended bill called for its production. Sands not only failed to produce it, but denied in his answer that any contract for plaintiff's coal was in his possession or had ever been written or delivered to him. His executrix did not answer the bill and no evidence was taken by any of the defendants. Kinsey's statement is uncontradicted. To the allegation that the deed was prepared at the instance of Kinsey and his associates or some one of them and presented to plaintiff and wife to be signed and acknowledged, Sands does not respond with any denial. Hence, it must be taken as true.

Sands' failure to produce the contract is relied upon as a very strong element in plaintiff's case. It is hardly pretended that there is sufficient evidence without this circumstance to establish the contents of that instrument in accordance with the theory and claim of the bill, and the view taken by counsel for appellant seems to stand almost upon the assumption that the non-production of the contract is an admission that, if produced, it would prove the allegations of the bill. Aside from his views, however, it is necessary here to ascertain what the weight and effect of the suppression of evidence is. The suppression of documents called for is not an admission that they would prove what is claimed respecting their contents. It is merely a circumstance warranting a strong inference against the party. There must be some other evidence in support of the claim. A *prima facie* case must be made, and, when made, and there is rebuttal evidence, casting a doubt upon the question of fact in controversy, the act of the party withholding evidence is taken strongly against him, and sustains the position of the plaintiff.

"When, on the unexplained refusal of a party to produce on trial documents which have been called for, the opposite party introduces parol evidence of the contents of the papers, then, if there be doubt, the probable interpretation most unfavorable to the suppressing party will be adopted. But this is a matter solely of logical inference. 'The mere non-production of written evidence,' says Sir W. D. Evans, 'which is in the power of

a party, generally operates as a strong presumption against him. I conceive that has been sometimes carried too far, by being allowed to supersede the necessity of other evidence, instead of being regarded ·as merely matter of inference, in weighing the effect of evidence in its own nature applicable to the subject in dispute.' " Whar. Ev. section 1267. "It follows, therefore, that the presumption arising from mere non-production cannot be used to relieve the opposing party from the burden of proving his case. But when a *prima facie* case is proved, sufficient by itself to sustain a judgment, then a party refusing to exhibit books which would, if produced, settle the matter either one way or the other, or to give other explanations, not only prejudices his case on trial, but precludes himself from subsequently objecting that the case of the opposite party, though sufficient for judgment, did not introduce all the facts." *Id.* section 1268.

It is only a circumstance weighing heavily against the party and does not dispense with the necessity of some independent evidence in support of every necessary element of the claim of the other party. This is well illustrated and clearly shown by the application of the rule in our own decisions. See *Wheeling* v. *Hawley,* 18 W. Va. 472; *Knight* v. *Capito,* 23 W. Va. 639; *Hefflebower* v. *Detrick,* 27 W. Va. 16; *Bindley* v. *Martin,* 28 W. Va. 775; *Union Trust Co.* v. *McClellan,* 40 W. Va. 405; *Webb* v. *Bailey,* 41 W. Va. 463.

In the light of this interpretation of the rule, the evidence for plaintiff must be examined. It consists of the testimony of the plaintiff, his son, Kinsey and Sidney Miley. Stout's son does not pretend to quote the language of the contract. He saw it, read it and signed as a witness, but does not say it mentioned only the Pittsburgh vein of coal. He says Kinsey came there to buy that vein, that they talked of that vein only, and that by the contract it alone was sold. Kinsey was not examined in chief as to the contents of the contract. After having been excused from the stand, he was recalled for further cross-examination by the defendants and then said: "To the best of my knowledge the option said all the coal the same as all the other options we had, except the Fleming tract of coal." Then on re-direct examination, he admitted that the amount of coal was described in the contract as being approximately fifty acres, that the price was based upon the acreage of the Pittsburgh vein and that, at the time the contract was made, the outcrop-

pings of that vein were pointed out to him. Plaintiff's testimony in chief is substantially the same as that of his son. He says he sold the Pittsburgh vein and was paid only for that vein. When, on cross-examination, he was interrogated as to the language of the contract, he did not say it was limited to the Pittsburgh vein. It appears from what he said that he bases his case upon quite different grounds. He said he looked at the contract to see if the coal was sold by the acre and it was, but not that he looked to see if it included only the Pittsburgh vein. The following question and answer discloses unequivo-cally the basis of his claim: "Q. And all you remember about it is that you sold it by the acre and that you remember very distinctly? A. Yes, sir, that's enough to remember about it. isn't it, and I remember it very distinctly, and I remember they said it was ninety-four and a fraction acres." That the price was determined by the acreage of the Pittsburgh coal is uncontradicted. Miley says he called upon Sands at the instance of Stout to obtain an admission from him or a release. The material part of his evidence is as follows: "I said Mr. Sands how much did you get and he said ninety-four acres, and I said that's what he said and I said how much did you pay for and he said ninety-four acres, and I said do you claim anything outside of that and he said not a thing in the world, and I said you ought to release that, and he kind of laughed and bluffed me, and I said will you release him? If you don't he will sue you. And he said I have two of the best lawyers in town, paid by the year, and they might as well do something as nothing. And I said all Mr. Stout asks you to do is to pay for all the land in the deed or release him, you have something there you haven't paid for and he kind of laughed and turned away and said it didn't amount to much, he didn't know whether there was any coal there or not and it wouldn't be operated anyhow, and he said Stout sent you here didn't he, and I said he did. I think that was the last word was said, he went out and I went about my business.

Q. State whether or not C. S. Sands in that conversation or at any other time told you wheather he bought the drift coal or Pittsburgh coal, or Freeport coal, or what strata of coal he bought of Stout, I mean?

A. He said that he had bought the Pittsburgh vein, but that was all he claimed, that Kinsey came and looked at that

vein of coal and the underneath vein of coal wasn't talked of or thought of, and Kinsey stated he didn't think of anything else, and that was all he wanted and all he asked." For its bearing upon this admission, and, in fact, as a part of it and to be read with it, the following additional statement made by Sands to Miley is given:

"A. Why, he said it seemed to be the custom to give the boundary lines, that was his answer to me, that seemed to be the custom to take in the whole thing, to give the boundary lines, but they only claimed the coal they surveyed and paid for.

Q. Now what coal do you say was surveyed and paid for?

A. Why he claimed the Pittsburgh vein, he called it the Pittsburgh at least." It further appears that, with one exception, all the other deeds taken by Sands in that neighborhood, in getting this coal property together, called for all the coal in the farms, although the price was based upon the acreage of the Pittsburgh vein. That is admitted so far as there is any testimony relating to the subject, and it is disclosed by plaintiff's witnesses.

Kinsey, it is to be remembered, is the only witness who makes an express and direct statement as to what the contract stated in respect to the quantity of coal described, and that is that it said all the coal. Stout is not held to the truth of this statement simply because he called the witness. He cannot directly impeach his own witness, by attacking his character or proving his contradictory statements, but he can show the fact to be different from what the witness states it to be by other evidence. "The general rule that one cannot impeach his own witness must not be understood to imply that the party is bound to accept such testimony as correct. On the contrary, it is very clear that the one producing a witness may prove the truth of material facts by any other competent evidence, even though the effect of such testimony is to directly contradict his own witness. * * * * A party is not bound by all the statements of a witness called by him, if adverse, even *though no other witnesses are called to contradict him;* the party may rely on part of such testimony, although in other parts the witness denies the facts sought to be proved. It has been well said that, if the other rule should prevail, 'every one would be at the mercy of his own witnesses, and if the first witness sworn should swear against him, he would lose the testimony of all

the rest. This would be a perversion of justice." Jones Ev. section 860; Best's Pr. Ev. section 645; Phillips Ev. (3d Ed., Part 2), 767; *Hickory* v. *United States,* 151 U. S. 303. Stout could have overcome Kinsey's statement by other evidence, but has he done so? He either could not or would not say that the language of the contract was limited to the Pittsburgh vein of coal. Neither did his son say so. Nor does the admission proved against Sands import that the language was so limited. The only direct evidence on that point is the statement of Kinsey. If it is broken down by anything in the record, it must be done by inference, deduced from the facts that the negotiations were for the Pittsburgh vein, that the price was based upon the acreage of the Pittsburgh vein and the admission of Sands that he claimed nothing but the Pittsburgh vein. This admission, however, must be taken altogether. It includes the fact that his deed included all the coal, and that he claimed the right to hold it for he unequivocally signified his intention to resist any litigation instituted for the purpose of changing his deed. The inference must also overcome adverse inferences, deducible from Stout's disclosure of the fact that he relies, not upon language in the contract, specifying the Pittsburgh coal alone, but that the contract said the coal was to be paid for by the acre, and all the acres are not paid for because of two supposed underlying veins, each equal to the entire area of the farm, making nearly three hundred and forty acres, and the admitted fact that the other deeds taken by Sands in the neighborhood are in conformity with his. How can the court reach the conclusion that he has made out *prima facie* proof of the fact that the contract was limited to the Pittsburgh coal? All this evidence must be reconciled as far as possible. Most of it can stand together consistently with the result that Kinsey's statement is true. It was in the power of Mr. Stout to directly contradict that statement and he did not do it, but chose to rely upon another ground, not necessarily inconsistent with its truth. If a man will not prove his own case by his own oath, how can he expect the court to make it out from the most unsatisfactory inferences? Had he made out a *prima facie* case, upon which the defendant casts doubt by rebuttal evidence, then the suppression of the contract, the best evidence of what it contained by the defendant, would have been conclusive against him and in favor of the plaintiff, but the plaintiff leaves his own

.case incomplete, without the intervention of any rebuttal evidence, based upon mere inferences, when he was on the witness stand, had seen the contract, had read the contract, and had signed the contract, but failed to state it contained the very thing upon which he relies in this case. If he knew that it was in there, the act of withholding his own testimony is one for which the court cannot be held responsible and an omission on his part which the court cannot supply for the purpose of holding the other party guilty of a reprehensible act, calling for a strong inference against him. Are we to assume that, in the course of this important litigation, he had not been advised by his counsel, as to what it was necessary for him to prove? He offers no excuse for his failure to say, and his son's failure to say, that the language of the contract was in reference to the Pittsburgh coal only. He does not even say he does not remember its language on that point. Moreover, all that he does say is drawn from him on his cross-examination. What inference is it possible to deduce from this except that he knew the contract contained no such language, and that, as honest men, he and his son could not testify that it did contain such language?

Having reached the conclusion that the plaintiff has wholly failed to prove the initial and basic fact in his case, there is no occasion to deliberate upon the many other questions sought to be raised, all of which were dependent upon, and have fallen with, this fact.

Seeing no error in the decree complained of, the Court affirms it.

*Affirmed.*