# CHARLESTON.

CASSIDAY FORK BOOM AND LUMBER Co *v.* TERRY, *Trustee.*

Submitted June 11, 1909.     Decided May 19, 1911.

1.  .VENDOR AND PURCHASER—*Constructive Trust in Land—Notice of Equitable Title in Third Person.*

    In a suit in equity, the object of which is to establish a constructive trust in land, founded upon an alleged fraudulent conveyance, made by a corporation, the fact that the deed of the corporation was delivered in consideration of money paid to, or a debt due from, the president of the corporation, without proof of want of consideration moving from the president to the corporation, is not notice of an equitable title to the land, so conveyed, in a third party.  (p. 584).

2.  CORPORATIONS—*Fraud of Agent—Notice.*

    That one of two deeds, contemporaneously delivered to the same grantee, subsequently turned out to have been forged, and was canceled as a forged deed, is not alone evidence of fraud on the part of the grantee in the acceptance of the other deed, or of knowledge, on his part, of fraudulent intent, on the part of the grantor or his agent, in executing and delivering the same.  (p. 585.)

3.  VENDOR AND PURCHASER—*Bona Fide Purchaser for Value—Burden of Proof.*

    When a claim to protection as a *bona fide* purchaser for value and without notice is involved, the burden is on the party denying the validity of the purchase, to prove notice of his equity, and, upon the other party, to prove good faith and payment of an adequate consideration.  (p. 590).

4.  SAME—*Bona Fide Purchaser—Consideration.*

    If the property in question in such case has been purchased along with numerous other pieces of property for a lump sum, the purchaser is not denied protection because he is unable to show that a specific price was fixed upon the property in controversy, if he proves payment of an adequate consideration for all the property included in the purchase.  (p. 590).

5.  DEPOSITIONS—*Examination of Party Before Trial—Refusal to Answer Questions—Necessity for Ruling.*

    A decree pronounced upon the pleadings and evidence, as made up and filed in the court below, will not be reversed for failure of a defendant, examined as a witness in another state, to answer questions propounded to him, if it appears that he

has submitted to an examination, answered many of the questions, substantially covering the case, but declined to answer others, claiming he is not bound to do so, and no ruling of the court below, respecting his duty to answer, has been asked for or taken, and he has had no opportunity to answer them after an adverse ruling on his objections thereto. By submitting the case, without having made an attempt to obtain answers to the questions, the plaintiff is deemed to have waived any rights he may have had respecting them. (p. 588).

6. PRINCIPAL AND AGENT—*Notice to Agent Binding Upon Principal.*
   The principle of law making notice to an agent bind his principal, applies in the case of a purchase of property through an agent, in violation of an equitable title thereto, or right respecting it, in a third party; and, if the agent with such notice purchases the property for his principal, the latter holds the title in trust for such third person. (p. 594).

7. SAME—*Existence of Relation—Necessity for Express Contract.*
   Proof of an express contract of agency is not essential to the establishment of the relation. It may be inferred from facts and circumstances, including conduct. (p. 595).

8. SAME—*Agency for Both Parties to Contract.*
   The law does not inhibit agency for both parties to a contract. (p. 594).

9. SAME—*Suit to Establish—Sufficiency of Bill.*
   A bill against a purchaser of land who has acquired it by an agent, on the theory of a purchase, in violation of an equitable right in the plaintiff, known to the agent at the time of the purchase, need not aver notice to the principal by or through the agent. It suffices to charge notice of the right generally. (p. 594).

Appeal from Circuit Court, Randolph County.

Bill by Cassiday Fork Boom and Lumber Company against Henry C. Terry, Trustee, and others. Decree of dismisal, and plaintiff appeals.

*Reversed and Remanded.*

*Van Winkle & Ambler,* for appellant.

*W. B. Maxwell, W. E. Baker* and *E. A. Bowers,* for appellees Henry C. Terry, E. J. Berwind and H. G. Davis.

POFFENBARGER, JUDGE:

From a decree of the circuit court of Randolph county, dismissing its bill against Henry C. Terry, Trustee, the Middle

Fork Coal & Lumber Company, the Roaring Creek Coal & Coke Company and Samuel B. Diller, praying relief against them in respect to two tracts of land, containing, in the aggregate, 1,788½ acres, the Cassiday Fork Boom & Lumber Company has appealed.

The appellant is a corporation to which, on the second day of November, 1891, said land, known as Lots No. 16 and 17, of a certain tract, containing, respectively, 916 acres and 872½ acres, had been conveyed by one O. C. Womelsdorf and wife. On the 16th day of August, 1893, said corporation conveyed the same to the Roaring Creek Coal & Coke Company, for and in consideration of $9,000.00 of the bonds of the Roaring Creek & Charleston Railroad Company and $131.00 in cash. At the time, there was a lien on the land for $2,500.00 of the original purchase money in favor of J. N. B. Crim and G. B. Harvey, which sum the Roaring Creek Coal & Coke Company agreed to pay. By deed, bearing date March 30, 1894, and admitted to record in the clerk's office of the county court of Randolph county, on April 6, 1894, said two tracts of land were conveyed by the Roaring Creek Coal & Coke Company to the Middle Fork Coal & Lumber Company, another corporation. On the 22nd day of May, 1894, an order was made by the directors of the Cassiday Fork Boom & Lumber Company, instructing its treasurer to give to S. B. Diller, for the re-purchase of said two tracts of land from the Roaring Creek Coal & Coke Company, said railroad company bonds and $131.00 in cash, and $500.00 to pay to the Roaring Creek Coal & Coke Company, on account of the unpaid purchase money, which it had then paid, or was supposed to have paid, to Crim and Harvey, and to arrange for the payment of the remaining $2,000.00 later. Diller was the President of the Middle Fork Coal & Lumber Company, and it was understood and agreed, that he was to take the bonds and cash to the office of the Roaring Creek Coal & Coke Company in New York and have a deed made conveying these tracts to the plaintiff company. As we have seen, the Roaring Creek Coal & Coke Company had already conveyed the land to the Middle Fork Coal & Lumber Company, and, on the 21st day of September, 1894, a deed was made by that company, through its president, S. B. Diller, conveying the

timber on the land back to the Roaring Creek Coal & Coke Company; and, on .the 11th day of June, 1895, said company, by Diller, its president, conveyed said two tracts of land to the defendant, Henry C. Terry, Trustee. The plaintiff alleges its ignorance, until a short time before the institution of this suit, July 21, 1898, of the conveyances made by the Roaring Creek Coal & Coke Company to the Middle Fork Coal & Lumber Company, and, by that company, back to the Roaring Creek Coal & Coke Company and Terry, Trustee; and fraud on the part of Diller and notice thereof and participation therein, on the part of Terry, Trustee, the Roaring Creek Coal & Coke Company and the Middle Fork Coal & Lumber Company. It further charges that the Middle Fork Coal & Lumber Company, though in form a corporation, consisted of the defendant, S. B. Diller, and never had any legal board of directors and never authorized any conveyance by Diller to Terry and never paid anything either to the Roaring Creek Coal & Coke Company or the plaintiff for said land.

An amended and supplemental bill was filed, making Edward J. Berwind a party defendant, and containing the following additional allegations of fact: That the defendant, Henry C. Terry, represented said Berwind in a large number of transactions relating to real estate and other property in Randolph county, including the two tracts of land in controversy and acted as his trustee in respect thereto; that Berwind had entered into a contract with Henry G. Davis, dated February 15, 1902, by which he had sold all of said property, including said two tracts of land, to said Davis; that said contract made specific reference to the claim of the Cassiday Fork Boom & Lumber Company to said two tracts of land, wherefore Davis had notice thereof; that, although the deed made by the Roaring Creek Coal & Coke Company, bearing date March 30, 1894, conveying said two tracts of land to the Middle Fork Company, antedates the meeting of the Cassiday Fork Company, at which the money and securities were turned over to Diller with instructions to re-purchase said two tracts of land, negotiations had been pending for the re-purchase thereof through Diller long before said meeting was held, and the Roaring Creek Company had agreed to reconvey the same in consideration· of the railroad bonds

and cash aforesaid, and it was then understood and believed that the title to said tract of land still stood in the name of said company, that the plaintiff did not, at that time, know the same had been conveyed to the Middle Fork Company, that Diller was President of the Middle Fork Company and fully aware of the right of the plaintiff to have the legal title to the land, which the Roaring Creek Company had conveyed to said Middle Fork Company; that it had also been discovered, shortly before the institution of this suit, that the Middle Fork Company, holding the title to said land with full notice of the plaintiff's right thereto in equity, had attempted to convey the same to said Terry; that about the date of the deed in question here, Diller had forged a deed purporting to convey from the plaintiff to said Terry, Trustee, 5,000 acres of land, which deed had, before the institution of this suit, been declared a forgery and set aside in another suit brought by the plaintiff against Terry and others in the circuit court of Randolph county; that Terry's participation in that fraudulent transaction, contemporaneous with the transactions complained of in this suit, and the intimate business relations existing between him and Diller since about the first day of January, 1895, and the fact that the railroad bonds mentioned had, in some way, passed into the hands of Terry, trustee, all taken together, established Terry's fraudulent participation in the transaction now in question; that no money or other thing of value was given by Terry, Trustee, or any person claiming by, through or under him, for said land; that as plaintiff is informed and believes, Berwind or Terry, Trustee, had, about the middle of April, 1896, advanced to Diller, on account of the purchase of certain lands and property, about $448,672.09, in consideration of which Diller, on demand for additional security therefor, undertook to transfer and convey said 5,000 acres and 2,000 acres of plaintiff's lands; that these conveyances were made in fraud of the rights of the plaintiff and accepted with notice of the fraudulent intent; that, if said lands were conveyed as security, Berwind had sold the same, together with other property of Diller's, for a sum largely in advance of the indebtedness, to-wit, $875,000.00, and besides, Berwind had received large returns from the property as proceeds of coal and timber taken therefrom; and that Davis, in

the purchase of said lands and other property, did not estimate said two tracts of land as having any value to him, in view of the claim of the plaintiff thereto, and did not pay anything therefor.

Berwind answered the amended bill, denying all allegations of fraud on his part and on the part of his trustee, and knowledge of any fraudulent intent on the part of Diller. His answer avers that all the property sold to Davis was sold for a lump sum and that the respondent is unable to say how much of the purchase money was treated or regarded as applicable to said two tracts of land. It further avers that the respondent, in the latter part of December, 1894, upon representations made to him by Diller, which afterwards proved untrue, had invested a large sum of money in the mortgage bonds of the Roaring Creek & Charleston Roalroad Company, and, in order to save the money so invested, was compelled to acquire further interests in the railroad property and also large quantities of timber and coal lands in the section of country in which the road was located; that his purchases of all this property were made in the name of Terry, his trustee; that he was informed and believed full and fair consideration in money had been paid for all of said property, including the two lots in question; that some of the lands so purchased were lands which Diller claimed to own or control and which he had, at the time, proposed to give respondent as security for a proposed loan and as a bonus for such loan; that none of said properties were in fact taken as security, it having been ascertained that Diller did not own the same, but that, on the contrary, they were purchased from the owners thereof or those who appeared by the records to be the owners thereof and were believed so to be; that he had allowed Diller, at his request, to attempt to find a market for this property, or make sale thereof, under an arrangement by which Diller would have profited, had such disposition been made, but not under any agreement or understanding which imposed upon the respondent any legal or moral obligation to make sale thereof; that neither respondent nor his trustee ever held said properties or any of them as security for advances to Diller; and that neither Diller nor his representative, nor any other person has or ever had, any rightful claim to any settlement of ac-

count in respect to the acquisition or disposition of said properties or any of them. The answer of Terry, trustee, to the bill and amended bill is equally as broad, direct and specific as to all allegations of fraud and notice thereof as that of Berwind, and makes substantially the same averments of fact, but goes more into the details thereof, giving dates, particulars, and circumstances not stated in the answer of Berwind, but all subsidiary in character and tending to the same legal effect as those stated more generally in the answer of Berwind. The answer of Henry G. Davis admits knowledge of the claim of the plaintiff, and sets up no rights or equities superior to those of Berwind and Terry, trustee. In substance and effect, it is the same as those of Terry and Berwind. It denies fraud and notice thereof on their part, avers good title in them and, therefore, in himself.

The evidence consists principally of the depositions of W. F. Diller, O. C. Womelsdorf and Henry C. Terry, and a large number of documents, brought into the record as exhibits and otherwise, principally copies of records in other suits, both in this state and in Pennsylvania, relating to the transactions between Diller, on the one side, and Terry and Berwind on the other. W. F. Diller was president and treasurer of the plaintiff company. He proves the sale of the two tracts of land to the Roaring Creek Coal & Coke Company in 1893, and the delivery to S. B. Diller of the bonds and cash, hereinbefore mentioned, for the re-purchase thereof, and says his company never intended to part with the title to said lots permanently, and that a re-purchase thereof was understood between the two companies from the date of the sale thereof. He says there was a verbal understanding and agreement, from the date of the conveyance, that this property was to be re-purchased. He further says he made repeated demands upon his brother for the deed from the Roaring Creek Coal & Coke Company to the plaintiff company, for said two tracts of land, and was assured by him that it had been made and sent to West Virginia for recordation, and later that he, said S. B. Diller, had the same in his safe in his office in the city of Philadelphia. He testifies further that, after the discovery of the forged deed for the 5,000 acres, his company examined the records as to the title to their other lands,

and found that Lots 16 and 17 had been conveyed, first, to the Middle Fork Company and then to Terry, trustee, and denies that any authority or direction had ever been given to make such conveyances. He further says that, in 1899, Terry informed him that he would probably be able to arrange for a sale of all the West Virginia properties to a Mr. Steck, of Pittsburg, and suggested the advisability of a conveyance of Lots 16 and 17 from him to the Cassiday Fork Company, and then a deed from that company to the purchaser, and said he could convey said lots with a recital that they had been misconveyed to him. Womelsdorf testified that in 1899, he, under instructions given to him by Diller, pursuant to a conversation had between Diller and Terry, at the office of the latter in Philadelphia, went to Beverley, West Virginia, and had a deed prepared for the conveyance, by Terry, of Lots 16 and 17 to the Cassiday Fork Company. Just what the conversation between Diller and Terry was, he did not know, since he had not heard all of it. This is evidently the occasion and conversation spoken of by W. F. Diller in his testimony. It further appears from the testimony of Womelsdorf that he was the General Manager of the Cassiday Fork Company in 1893, and for some time thereafter, charged with the duty of taking care of its lands and paying the taxes thereon, and that, probably in the year 1893, S. B. Diller came there in company with one Slaymaker, of the firm of Witmer & Sons, and a man by the name of Savage, and executed, on behalf of the Middle Fork Company, a contract with Whitmer & Sons, for the cutting of timber on Lots 16 and 17, which contract Womelsdorf witnessed, but assuming that Diller, who had been prominent, conspicuous and influential in respect to the affairs of the company, was doing nothing more than he had authority to do and was proper, he did not inform the Cassiday Fork Company of the transaction. He was not only general manager of said company, but a stockholder and director. Terry's deposition is very lengthy. Deeming a great many questions irrelevant and immaterial, he declined to answer them, sometimes of his own volition, and, at other times, by direction of his counsel. He admits that he was trustee for Berwind, and, as such, handled and disbursed for him, in the purchase of various properties in West Virginia, many thousands of dol-

lars. How much was paid for each of the several properties, he does not disclose and he repeatedly refused to state the exact amount paid for the two tracts of land in question, but persisted in the statement that they were included among the purchases made and had cost his principal a large amount of money. He says Lots 16 and 17 were conveyed to him by virtue of a written agreement between Berwind and S. B. Diller, which is not produced and which he says cannot be found. He supplements this with the following additional statement: "The original conveyance to me as trustee by the Middle Fork Company was an absolute one for a full consideration, so far as I can now state. There was no specific sum that I can fix in my mind which made up that consideration, but the deed, as I recall it, not having looked at it for some time, was an absolute one and was a part of the transaction which involved the payment of a very large sum of money by Mr. Berwind through me, in excess, I believe, of what the value of these lots was." Being asked what the amount advanced was, he said: "I cannot recall the exact amount accurately, but it was approximately more than four hundred thousand Dollars." The conveyance was made, it will be remembered, by the Middle Fork Company, and Mr. Terry says, in response to a question, "I do not think any consideration was paid to the Middle Fork Coal & Lumber Company, but full consideration was paid to Mr. Samuel B. Diller individually, to the best of my knowledge, although I cannot state in dollars and cents how much, but it was a part of the general advances made by me." He says further: "I do not recall the payment of any specific sum, but I was making advances on behalf of Mr. Berwind to Mr. Diller almost continuously, and on the day that the deed was delivered, which day I do not recollect, I may or may not have paid Mr. Diller money. But I certainly paid to him, at some time or other, in some way, moneys which covered the consideration for the conveyance of this property, but I cannot now recall what the value of the property in question was fixed at." Being asked as to the amount paid for the 5,000 acres and Lots 16 and 17, he replied that he could not tell the specific amount paid for said lots or any other lots embraced in the question, and said he did not think a reference to any books or accounts kept by him would disclose such infor-

mation.  He says he thinks the deed for the 5,000 acre tract and for Lots 16 and 17 were delivered to him at the same time.  As to whether the advancements made and charged to Diller before the deed for Lots 16 and 17 were delivered, included moneys that had been paid in the acquirement of the stock of the Roaring Creek & Charleston Railroad Company, he declined to answer.  He also declined to say whether the property which had cost him over $400,000.00 included $100,000.00 of the bonds of the Roaring Creek & Charleston Railroad Company, and also to say what property he had bought with said $400.000.00 other than the land in question; but he did say the amount charged against Diller was for moneys advanced to him in a general way and was represented in property which Diller had secured to be conveyed to him as trustee and that these properties included Lots 16 and 17.  He says all these advancements were made to Diller personally and not to the corporations represented by him and that he understood that Diller owned a majority of the stock of the Middle Fork Company, substantially all of it, as he believed at the time.  The minute book of the Middle Fork Company was demanded of him and he said he was unable to produce it.  This important book was not produced by anybody and its contents are not disclosed by any part of the record.  A matter deemed important by counsel for the appellant, is a disclosure made by Terry, of a transaction between him and Diller in April, 1896.  On the 17th day of April, 1896, Diller made a written proposition to purchase numerous tracts of land, including the 5,000 acre tract and Lots 16 and 17 and a vast amount of personal property for the sum of $748,672.00, payable in sixty days from that date, for which sum he gave his collateral note, pledging, for the payment thereof, all of the property named in the instrument, and, in addition thereto, a large amount of other property.  This note, dated April 18, 1896, recited the delivery of the property to Terry, Trustee, as collateral, authorized sale thereof in case of default, and gave authority to said Terry, as attorney at law, or to any other attorney of any court of record in Pennsylvania, or any other state, to appear for the maker thereof and confess a judgment against him for the amount thereof with attorney's fees and costs.  Default having been made, Terry

sold the property at auction in his own office in Philadelphia and purchased the same for the sum of $100.00. which amount he credited on the note, and, at the June Term of court, 1896, took a judgment against Diller for the sum of $748,672.09, and had execution issued thereon which was returned *nulla bona.* This transaction occurred abount two years after the conveyance of Lots 16 and 17 to the Middle Fork Company, the deed from the Roaring Creek Coal & Coke Company to it having been made March 30, 1894; but it may have been contemporaneous with the recordation, in Randolph county, of the deed from the Middle Fork Company to Terry, which, however, appears to have been executed in June, 1895. But if Diller was virtually the owner of the Middle Fork Company, and had been paid for this land in the manner in which Terry says he was paid, and could, as such virtual owner of the Middle Fork Company, convey the lands to Terry in compliance with his alleged agreement, or had authority from the board of directors to do so, the consideration, if any, had no doubt been paid prior to the date of the deed as well as to the recordation thereof. Mr. Terry says the transaction of April 17 and 18, 1896, was regarded by them as in the nature of an option, since the property belonged to him as trustee and he had made a sort of an agreement of sale to Diller, to enable the latter to make disposition of the property, if he could, and he having failed to do so, the sale of the property by him, as collateral security for the note, only passed such interest as Diller had, an option to purchase, which was really of no value, and that the sale was nothing more than a mere formal extinction of that right. Terry still held the legal title and the sale extinguished whatever contractual interest Diller had. Being further examined as to the properties mentioned in Diller's memorandum of purchase, he says he had paid for all of them prior to that time, and there was no property mentioned in that proposition which he had not theretofore purchased and paid for with moneys of Berwind. On cross-examination, he testified that, prior to the time, he received the deed for Lots 16 and 17, he had paid for them and that he was not treating money paid for other properties as having been paid for these lots, and says he had overpaid Diller at the time of the delivery of the deed; and that he had not, at the time of the

conveyance of said lots to him, any notice or knowledge of any authority vested in Diller by the Cassiday Fork Company to re-purchase or secure a re-conveyance to it of said lots. Admitting the possession of the railroad bonds, delivered by the Cassiday Fork Company to Diller for the re-purchase of Lots 16 and 17, he says he had no notice or knowledge of the terms or conditions on which Diller had acquired possession of said bonds, and that he had no knowledge, at or before the time of the conveyance of said lots, of any fraud on the part of Diller in procuring the land to be conveyed to the Middle Fork Company. He denied also that, at the time he received the conveyance of Lots 16 and 17, or prior thereto, he had any notice or knowledge of the forgery, by Diller, of the deed conveying the 5,000 acre tract. He further denies that, at the time of said conveyance, he had any notice or knowledge, directly or indirectly, of the claim of the Cassiday Fork Company to said lots or any part thereof.

According to the testimony of William F. Diller, the Roaring Creek Coal & Coke Company took title to the two tracts of land and held the same temporarily for a special purpose, on the accomplishment of which it was to be reconveyed, on re-payment of the purchase money. He says that, in order to aid the building of the Roaring Creek & Charleston Railroad, the land was conveyed to the Roaring Creek Coal & Coke Company, with the understanding that it should be re-conveyed as soon as the Roaring Creek Coal & Coke Company should obtain some other coal lands, and that this was verbally agreed upon from the time the original conveyance was made in August, 1893. Whether this is sufficient evidence to justify the view that the Cassiday Fork Company held the equitable title, as vendee under an executory contract of sale, might be questionable, since the deed of conveyance was absolute and there was to be no re-conveyance, according to this testimony, until the Roaring Creek Coal & Coke Company should have obtained some other coal lands. It might be regarded as having been a conditional sale which placed both legal and equitable title in the grantee, subject to be defeated by a subsequent contingency. However, conceding, for the purposes of this inquiry, that the plaintiff held the equitable title, it cannot have relief, unless it appears that Terry acted

in bad faith or had notice of the fraud of Diller or of the equitable title of the plaintiff company, or did not pay full and fair consideration for the property. A more accurate statement would be that, in view of the equitable title in the plaintiff company, the burden is upon Terry to prove that he purchased in good faith, paid full and fair consideration and had no notice of the equitable title of the plaintiff company. However, as regards notice, the rule seems to require no more than a denial, and then the plaintiff must overcome it by proof; but a purchase in good faith and payment of an adequate price are affirmative matters, which the defendant must aver and prove.

The conveyance of the land by the Middle Fork Company, a corporation, to Terry, for a consideration passing to Diller, the President of the corporation, who executed the deed on behalf thereof, is relied upon as a circumstance proving notice of a misappropriation of the property of the Middle Fork Company by its agent, and also as proof of bad faith on the part of Terry. It is urged that this circumstance brought home to Terry notice of the equitable claim of the Cassiday Fork Company to the land in question. This seems to be an attempt to carry that fact beyond what it naturally and fairly imports, If it can be said to prove a misappropriation on the part of Diller, abuse of his power as president, a turning over of the property of that company in satisfaction of his own personal debt, we do not see how it can go further and fix upon Terry notice of transactions, contractual relations, or equities subsisting between the Middle Fork Company and a third party, the Roaring Creek Coal & Coke Company. The acquisition of the plaintiff's equitable claim had no apparent connection with the conveyance to Terry. They were separate and distinct acts, not only in nature, but in time, place, circumstances and parties. Nor does it necessarily, logically or probably result differently when we add the circumstance that Terry or Berwind obtained from Diller the railroad bonds, placed in his hands for delivery to the Roaring Creek Coal & Coke Company to obtain a re-conveyance of the land: for there is nothing in the record that indicates any knowledge or information on the part of either Berwind or Terry as to how those bonds came into the possession of Diller. For all that appears here, they may

have been taken from him in absolute ignorance of the means by which, the source from which, or the purpose for which, he had obtained them. The authorities invoked for the proposition that property taken by deed from a corporation upon a consideration moving to the president thereof in his individual capacity, is to be treated and regarded in equity as having been misappropriated by the officer, and fraudulently acquired by the grantee, are not applicable here. The corporation is not asking any relief against the act of its president. The plaintiff is a third party, attempting to rely upon this fact as proving notice, not only of misappropriation of the corporate property, but of the additional, remote and disconnected fact that it, the plaintiff, was equitably entitled to the property, by virtue of an oral agreement, knowledge of which, on the part of the grantee, is not shown in any way.

The acceptance, by Terry, of a forged deed at the time he accepted the deed in question, is relied upon and urged as a circumstance proving his participation in a fraudulent contemporaneous transaction, and, therefore, as evidence of his fraudulent intent and bad faith in the acceptance of the deed here involved. The adjudication of the fact of forgery of a deed contemporaneously accepted does not imply or argue any knowledge of the forgery on the part of Terry. It is not pretended that he forged the deed, and the cancellation thereof as having been forged by Diller destroyed his title independently of any knowledge or motive on his part in accepting the same. It being a forged deed, he acquired no title under it, and could have acquired none, although he accepted it in good faith, without any notice of the forgery and paid full and adequate consideration for the property. Had it been set aside as having been fraudulently obtained, the adjudication would necessarily have implied guilty participation in the fraud by the grantee. There is no evidence here tending to prove knowledge on Terry's part of the forgery at the time he accepted the deed.

The fault found with the evidence offered by the defendant, Terry, to prove payment of the value of the land, is his failure to show the value at which the land was taken by him, or, in other words, the price agreed upon between him and Diller at which it was credited on the large advancements made to the

latter.    That Terry, for and on account of Berwind, made
large advancements to Diller, amounting to more than $400,-
000.00, does not seem to be questioned, and the circumstances
and transactions disclosed by the record leave no doubt of the
fact.    The witness swears that these advancements were not
only equal to, but greatly in excess of, all the property convey-
ed to him by Diller and others in consideration thereof.    He
further states his inability to say just what part of the money
so advanced was apportioned or applied to the purchase of these
two tracts of land, and says none of the books, papers or mem-
oranda kept by him will disclose such fact.    His statement
amounts to this, that Diller was in debt to him for these ad-
vancements largely in excess of all the property he had conveyed
to him, including these two tracts and the 5,000 acre tract,
which indebtedness was acknowledged and admitted by Diller at
the time and the conveyances made without any such appor-
tionment.    It is not difficult to conceive a situation of that kind.
Instances of the kind often occur in the course of large business
transactions, resulting disastrously to the parties.    It appears
that Diller's operations in Randolph county were far beyond
his financial means and ability and resulted in his insolvency.
It is true that Berwind did not meet a like fate, but he appears
to have been a wealthy man, able to bear misfortune and advers-
ities by making additional investments and combining properties
advantageously so as to put them upon the market in an at-
tractive form and retrieve his losses.    Terry's failure to specify
or fix the value put upon these two tracts of land does not amount
to an obstinate refusal to answer in that respect.    It is ac-
companied by his statement of inability to do so by way of
explanation and excuse; and, for all that we can see, his state-
ment is true, and the truth thereof is made highly probable by
the circumstances revealed by the record.    An attempt is made
to cast doubt upon the truth of his statement, as well as upon
his good faith, by the taking of the judgment note of April
18, 1896, the sale of the properties pledged for the payment
thereof, after default had been made in respect thereto, and the
judgment obtained for the amount due thereon.    These trans-
actions were, according to the testimony of the witnesses, long
subsequent to the execution of the deed here involved and ap-

pear to have been independently thereof.   The proposal of pur-
chase made by Diller to Terry treated these lands as then
held by Terry.   Just why Diller should have obligated himself
in the manner in which he did for about $300,000.00, it may
be difficult to conceive.   On the showing here made, he evi-
dently expected to sell the properties for more than $750,000.00.
He took them at a valuation of about $748,000.00 from Terry.
Apparently this would have given Terry a profit of something
like $300,000.00, and, to have obtained any additional profit,
it would have been necessary for Diller to have sold for more
than that amount.   At this time he was insolvent.   Being so,
he could afford to be liberal in his undertakings and desperate
in his adventures, having all to gain and nothing to lose.   What
prospects he had for effecting such a sale and meeting his obli-
gations, within sixty days, is not disclosed by the evidence.
Loose and improvident as this arrangement appears to have been,
it did not relate solely to these two tracts of land, and nothing
in its terms or the proceedings relating thereto, tends to show
that Terry, at that time, had any knowledge of the equitable
claim of the Cassiday Fork Company, or specific intention to
defeat the same.   He and Berwind had had extensive dealings
with Diller, out of which many controversies might have arisen,
and this arrangement seems to have made largely with a view
to a final settlement between them and an extinction of any
claims that Diller might otherwise thereafter have set up against
them.   At the same time, Diller executed an instrument under
seal, releasing Berwind, his heirs, executors and administrators
from all manner of actions and causes of action, suits, debts,
dues, accounts, bonds, convenants, contracts, agreements, judg-
ments, claims and demands whatsoever, in law or equity, which
he then had against said Berwind or ever had had or which his
heirs, executors administrators or assigns or any of them might
have for or by reason of any cause, matter or thing whatso-
ever.   No doubt Diller at this time had numerous creditors who,
it was supposed by Berwind, might attempt to set up claims
against him on the theory of indebtedness to Diller, and the
apparent object of all these transactions was to forestall and
provide against the assertion of any claim, and, in the absence
of evidence tending to show a secret agreement or arrangement

to cover up assets of Diller in the hands of Berwind, to the detriment or prejudice of the creditors of the former, the taking of this release and the judgment note and the judgment on the note, could be regarded as nothing more than mere precautionary transactions, unobjectionable in any view except that of creditors, on an attempt by Terry to set up, to their prejudice, the large judgment, founded on the note of April 18, 1896. The plaintiff here has not that status. It comes claiming certain specific property as the equitable owner thereof, not as a creditor, demanding participation in the distribution of the assets of an insolvent estate.

Much argument to sustain the bill is predicated upon the repeated declinations of Terry to answer questions propounded to him. His obstinacy or failure to diclose matters within his knowledge or power does not prove the plaintiff's case, or relieve it from the duty to sustain the burden of proof, put upon it by direct and positive denial of the allegations of fraud. It is only when a *prima facie* case is made by one party and doubt is cast upon it by the rebuttal evidence of the opposite party, or otherwise, that suppression or withholding of evidence raises an inference against the party failing to produce evidence which it is in his power to produce, and determines the point in favor of the other party. *Stout* v. *Sands,* 56 W. Va. 663.

If we could assume that, under the statutes authorizing the taking of the testimony of opposite parties, and the taking of depositions out of the state, the courts of this state have the powers and remedies, for compelling specific and full answers to questions, conferred by statutes providing for the propounding of interrogatories, the plaintiff has neglected to invoke the exercises of such powers and the application of such remedies. Instead of making application to the court below, as it may have had the right to do, for rulings upon the refusal of the defendant to answer questions, and direction from the court as to whether he was bound to answer them, or whether he had sufficiently answered, so as to give him an opportunity to make further answers, in case the court ruled against him, the plaintiff submitted its case on the evidence as it appears here. There was not a total failure to answer, and the answers, in some form and to some extent, covered all the questions propounded. In

such a state of the case, neither a judgment of non-suit against a plaintiff, nor a default, against a defendant, can be rendered, in those jurisdictions in which statutory powers to do so in proper cases are conferred upon the courts. A party who has answered, is entitled to a ruling upon the sufficiency of the answers made, and the propriety of the questions propounded, before such judgment can be rendered against him. By submitting its case, without requiring further answers, the plaintiff waived its right to a decree *pro confesso,* if any it had, and is bound by the evidence as it stands. *Fels* v. *Raymond,* 139 Mass. 100; *Harding* v. *Morrill,* 136 Mass. 291; *Wetherbee* v. *Winchester,* 128 Mass. 293; *Townsend* v. *Gibbs,* 11 Cush. (Mass.) 159; *Amberst &c. Ry. Co.* v. *Watson,* 8 Gray (Mass.) 529; *Cooper* v. *Central Railroad,* 44 Ia. 134; *Hogaboon* v. *Price,* 53 Ia. 703; *Garvin* v. *Cannon,* 53 Ia. 716; *McNamara* v. *Ellis,* 14 Ind. 516; *Cleveland* v. *Hughes,* 12 Ind. 512.

The issue here is whether Terry is a purchaser for value and without notice. Thus far, we have treated him and Diller as strangers, dealing at arm's length, and, if that was the relation subsisting between them, we have no doubt of the correctness of the conclusions stated. But, if the circumstances, taken as a whole, establish a relationship of principal and agent between them, Terry cannot be regarded as a *bona fide* purchaser even though he had no actual knowledge of the fraud of his agent. That a principal cannot retain the benefit of the fraudulent or unauthorized act of his agent is a proposition universally recognized and acted upon by the courts. In seeking to hold the property, he adopts the fraudulent act and thus destroys his own title, in one aspect of the case, and ratifies it and binds himself in the other, according to the nature of the demand made upon him by the injured party. This is undoubtedly the rule applicable between the immediate parties to the contract. Is the principle operative in the case of a purchase through an agent, in violation of the equitable rights of a stranger, with notice to the agent? The authorities uniformly answer this in the affirmative. *Le Neve* v. *Le Neve,* Amb. 436; 2 White & Tud. L Cas. Eq. (4th Am. Ed.) t. p. 109, m. p. 35; *Clark* v. *Fuller,* 39 Conn. 238; *White* v. *King,* 53 Ala. 162. On this principle, notice to a trustee is notice to his *cestui que*

trust. *Ins. Co.* v. *Railroad Co.,* 32 W. Va. 244; *Mining Co.* v. *Coal Co.,* 8 W. Va. 406; *Beverley* v. *Brooks,* 2 Leigh 425; *French* v. *Loyal Co.,* 5 Leigh 627; *Wickham* v. *Lewis,* 13 Gratt. 427; *Chapman* v. *Chapman,* 91 Va. 297. In these Virginia and West Virginia cases, the trustee is regarded as a purchaser, and not as a mere agent, but the other cases cited involved nothing more than simple agency. The case falls clearly within the general principles of notice. Wade on Notice, sec. 672, says the rule may be tersely expressed thus: "Notice to an agent is notice to the principal." This author further says it is either actual notice or the equivalent thereof. The rule is subject to some limitations, but none, so far as we have observed, that forbids its application in the class of cases under discussion.

The defense of a *bona fide* purchase for value is affirmative in character, though, ordinarily, the burden of proof as to notice is on the plaintiff. The rules and principles of equity, not only make it affirmative in the ordinary sense of the term, but impose an additional burden. They require the purchaser not only to prove his purchase, but also that in equity and good conscience he ought to be permitted to retain the property. The existence of an equity in violation of which he obtained the property constitutes ground of appeal to his conscience, demanding a full disclosure of all material facts and circumstances. He must deny notice, even though it is not alleged and both plead and prove payment of an adequate consideration. *Lohr* v. *George,* 65 W. Va. 241.

Enough has been said of defendant's testimony to show uncertainty and indefiniteness as to the character of his transactions in general. He repeatedly says he advanced to Diller large sums of money and took these lands on account of the advancements. He stubbornly refused to give any price agreed upon between him and Diller for them, protesting his inability to do so, since they were taken in part satisfaction of large sums of money advanced. It is hardly probable that the lands and other properties, such as the bonds entrusted to Diller, to be exchanged for the lands in question, were paid for in advance. Circumstances disclosed by the record make it equally improbable that these large sums of money were loaned to Diller. Then

upon what basis were they advanced? They could have been advanced to him as agent, if at all. It appears from the separate answers of Terry and Berwind that about December, 1894, Diller, having been associated with his brothers and other parties in the promotion of various · land deals and mining and railroad enterprises in Randolph county, applied to Berwind for financial assistance in the form of purchases of bonds of corporations he was interested in and loans on the faith of some of these properties. Relying upon Diller's representations, Berwind purchased a large amount of the bonds of the Roaring Creek & Charleston Roailroad Company. Berwind says, in an answer in another suit, made a part of this record, that a written agreement was entered into between him and Diller, on the faith of the representations of the latter, by which he agreed to render such aid and was to have, in addition to ample security, a certain interest in some of the property as a bonus or reward. He subsequently ascertained Diller's inability to carry out this agreement and the insufficiency of the properties as security, wherefore it became necessary for him to make large investments, on a different basis, in order to save what he had invested in the railroad bonds. Accordingly, the agreement was abandoned, and he proceeded to make purchases and investments in Randolph county, through Terry and other agents The answer in this cause does not set this out so much in detail, but pursues the same general course of defense. Terry says, in his testimony, he made his large advancements in pursuance of that agreement and on the faith thereof, and not under any agreement of his own with Diller, although he protests that he paid the latter full consideration for the land. This does not accord with Berwind's admission, just stated. Indeed, Mr. Terry's answer to the amended bill substantially agrees with the defense of Beryind. He says: "It is true that this respondent, Henry C. Terry, Trustee, and said Samuel B. Diller were on intimate business relations with reference to properties in said Randolph county. This was natural and almost necessary, because, upon what turned out to be untrue representations by said Diller, Edward J. Berwind, acting through this respondent, had been, in or about December, 1894, induced to invest a large sum of money in the acquisition of mortgage bonds of

the Roaring Creek & Charleston Railroad Company, and, in order to make this investment of any avail, and, indeed in order to save the money invested, it became necessary for said Berwind to acquire further interest in said Railroad and also tracts of coal land in the vicinity of said railroad, and, through this respondent as trustee, said Berwind did proceed, in the early part of the year, 1895, to acquire this interest and these tracts of land, in every instance paying full and fair consideration therefor in money to the owners or those who were believed to be the owners or those who represented or acted for the owners thereof. Among these tracts so acquired and so paid for were said lots Nos. 16 and 17, some of these lands, so acquired by the respondent as trustee for said Berwind, were lands which said Diller had, prior to the investment by said Berwind in said railroad bonds, represented to said Berwind as owned or controlled by him, Diller, and which said Diller had at that time proposed to give said Berwind as collateral for a proposed loan; but none of them was obtained by said Berwind, or by this respondent as trustee, as collateral or security for any loan, as it was early discovered that none of said lands was owned . by said Diller and only some of them by companies in which he was interested and which he managed and claimed to control, and none of them was acquired by said Berwind or by this respondent as trustee, except upon full and fair consideration paid to the owners thereof, or to those who appeared by the records to be the owners thereof, and were believed by this respondent to be the owners thereof, or to those duly authorized to act for such owners. And neither said Berwind, nor this respondent, had any knowledge or information, prior to the acquisition of lots Nos. 16 and 17 by this respondent, of any defect in title, or anything whatever, that would in any way impeach, or tend to impeach, or cast any suspicion on, the respective conveyances by which title became vested in this Respondent."

Diller was not the sole owner of the properties he represented in his application to Berwind. A great deal of it was held by corporations in which Diller was a stockholder and in some of which he was an officer. These concerns were financially embarrassed, when both Berwind and Terry first met him. He

applied to Berwind for funds, representing the properties as then jeopardized by indebtedness.  The whole record discloses, too, that Diller was not a man of any considerable means or wealth, and he came out of these transactions apparently, if not actually, insolvent.  He and his associates were loaded down with wild, unproductive lands, the market value of which depended largely upon undertakings they were wholly unable to carry out.  Under a greater burden than they could carry, they had come to Berwind for aid, and he had found them in much worse condition than had been represented to him.  Acting as a representative of Mr. Berwind, in the effect to make good his investments in Randolph county, Mr. Terry must have been equally well informed as to Diller's financial condition.  If it be true that $400,000.00 was put into the hands of Diller by Terry, it is almost inconceivable that he received it as a borrower or as a vendor of property.  That he did not own all the properties acquired with that money, and Terry's knowledge of this, are fairly inferable from the facts disclosed by the record.  The latter knew a great deal of it stood in the names of corporations and individuals other than Diller, and yet Diller seems to have had something to do with the acquisition of nearly or quite all of it.  The answer substantially admits this, and Terry's testimony, broadly considered, conforms to the answer.  He distinctly says the amount advanced to Diller was "approximately more than four hundred thousand dollars".  This seems to have been regarded and treated as the original cost of the properties embraced in the contract of sale or option of April 17, 1896, being apparently all that had been acquired in that part of West Virginia by Mr. Terry.  Many of these were admittedly purchased from persons other than Diller and yet, according to this testimony, the money went through his hands.  In other words, Terry put this vast sum of money in the hands of Diller with which to purchase the property of other people, and take conveyances thereof, not to himself or in his own name, but in the name of Terry.  Thus, through Diller, Terry gave money in exchange for real and personal property.  This clearly imports agency and the circumstances suggest agency as the safest, most expedient and efficacious arrangement.  Diller knew all the properties and their owners.  Terry's knowl-

69 W. Va.

edge thereof was limited. As agent, his relation was confidential. All advancements became immediately due and the principal had the protection of the criminal laws against misappropriation. As vendor or debtor, he would have had vastly greater liberty and discretion and Berwind less protection and more limited remedies. Mr. Terry is significently silent on the subject of the exact relationship between himself and Diller. No definition thereof can be found in either his answer or his testimony. He lays stress upon payment and lack of personal knowledge of fraud. If Diller was his agent, he can truthfully do both and still not make out a good defense. Notice of the plaintiff's equity on the part of his agent was notice to him, and the fraud of his agent avoids the contract as completely as if it had been his personal act. We think it was his clear duty to negative the inference of agency, arising from all the facts disclosed, and, as he has not specifically contradicted it, the plaintiff must be accorded the benefit thereof.

Diller's agency of some of the corporations from which the property was acquired does not preclude the relation of principal and agent between him and Terry. Such double agencies afford opportunities for fraud, but no rule of law forbids them. It is obviously possible for the agent to represent both principals fairly and honestly. Clark & Skyles, Agency, sec. 414. Mr. Terry, fully advised of Diller's agency for the owners of the property, and employing him as agent to purchase it, cannot be heard to say the existing relation of Diller to the owners rendered it impossible for him to accept an inconsistent agency. Terry could assent to agency for both parties. The dual capacity only imposed further duties upon the agent and required of him greater care and circumspection. The assent of the former employers to the subsequent inconsistent employment was not essential thereto. With knowledge of the existing relation, Terry could bind himself.

Though the bill, proceeding upon the theory of personal notice of fraud and a trust estate of Diller in the hands of Terry, ignores agency as ground of relief or means of notice, we do not think this precludes adoption of that theory. The bill distinctly charges a purchase with notice, and we are aware of no rule requiring specification of the mode or manner of

acquisition thereof.    Besides, a prior equitable title in the plaintiff having been shown, establishment of a better right by purchase for value and without notice became an affirmative defense, requiring denial of notice and proof of payment of an adequate price.    Occupying such a position, the defendant was bound to repel every inference of knowledge of the prior equity, whether actual in the sense of personal or of different character and tantamount to personal knowledge.    He has the affirmative of the issue and is partially excused from the burden of proof under a mere rule of convenience, relieving from duty to prove a negative.    The operation of that rule ceases with the reason therefor.    When facts are disclosed, raising a clear inference of knowledge or a relation from which it results, as matter of law, that rule does not excuse silence.    To require the defendant to repel it imposes no hardship upon him and places him at no disadvantage.

We deem the evidence of agency sufficient in kind as well as quantity.    An admission of proof of an express contract of agency is not essential.    The authorities uniformly say the relation may be inferred from facts and circumstances.    *Siers* v. *Wiseman,* 58 W. Va. 340; Clark & Skyles, Agency, sec. 64, citing a very long list of cases fully sustaining the text.

Pending this suit, Henry G. Davis, having admitted notice of the plaintiff's claim, purchased this property, with other holdings of Berwind.    Hence, his rights are wholly dependent upon those of Terry.    In purchasing the lots involved here he took the risk of title in the latter.

As Terry paid off a prior lien on the property and claims to have paid some of the taxes thereon, he or Berwind or Davis is entitled to have such sums re-paid, as a condition to relief.

The Roaring Creek Coal & Coke Company, holding the title to the timber on the land, made no defense.    The process upon the original bill was served on it, but it was proceeded against on the amended bill by order of publication, no representative of it being found in the state upon whom service could be had. It has not appeared nor made any defense.    As to it, the allegations of the original bill are very brief and perhaps defective.    The amended bill takes no notice of it.    In this imper-

fect state of the record, we do not feel warranted in pronouncing a decree on that branch of the case.

Before entering upon the inquiry as to fraud, we suggested possible lack of equitable title to the land in the plaintiff. Having concluded that Terry was a purchaser with notice of the facts relating to the title, it becomes necessary now it say whether, by virtue of those facts, the plaintiff had such title We think it had. The evidence of a contract for re-conveyance already adverted to is uncontradicted. William F. Diller testifies positively to a verbal agreement for reconveyance at the date of the conveyance of the Roaring Creek Company. Since that company, pursuant to the agreement, did actually convey the land to the Middle Fork Company, and makes no denial of the agreement or its deed, neither the statute of frauds nor the rule inhibiting parol evidence to contradict written agreements is involved. Though the conveyance was not made to the plaintiff, the circumstances strongly indicate that it was made in consideration of the bonds and money delivered to Diller with which to procure the re-conveyance. Diller was virtually the Middle Fork Company. Neither he nor it had any money. Terry made no purchase from the Roaring Creek Company. Diller manipulated the title out of that company into the Middle Fork Company and then into the hands of Terry, and, though subsequently, yet near the same time, got the bonds and money from the Cassiday Company ostensibly to re-purchase these lands for it, and represented that he had done so. Thus the Middle Fork Company obtained the title, with knowledge of the Cassiday Company's right, for Diller was its president and virtual owner, and so did Terry by making Diller his agent in the procurement of the title.

Our conclusion is to reverse the decree complained of, enter a decree, requiring Edward J. Berwind, Henry C. Terry, Trustee, and Henry G. Davis to convey said two tracts of land to the appellant, on payment to them, or such of them as may be entitled thereto, the money expended by said Terry, trustee, in discharging liens to which said property was subject at the date of his acquisition thereof, and remand the cause for ascertainment of the sum so expended and the person or persons to whom due, and for further proceedings necessary to the execution of

such decree, as well as for such further proper proceedings, respecting the timber on said land, as may be desired, including amendment of the bills or either of them.

Costs in this Court as well as in the court below will be decreed to the appellant.

*Reversed and Remanded.*

MILLER, JUDGE, *(concurring)*:

I concur in reversing the decree below based on the relationship of principal and agent between Terry and Diller. But I do not agree that it is necessary to establish that relationship to justify reversal. In my view of the evidence it fully establishes the fraud and collusion between Terry and Diller, as charged in the bill, and that the decree below denying plaintiff relief on that ground is erroneous. I do not intend, however, to detail the evidence or discuss the familiar legal principles, applicable in such case. I only wish to record the fact that my concurrence in the decision is not based alone on the theory of principal and agent.

BRANNON, JUDGE, *(dissenting)*:

This case involves the question whether Terry, when he acquired title, had notice of the equitable title of the Cassiday Fork Boom and Lumber Company. This is purely a question of fact dependent on oral evidence and circumstances. As to the question whether Terry had actual notice, fixing upon him sedate, intentional fraud, the case is one resting solely on oral evidence to fix fraud. I can safely say there is no evidence of such notice except circumstances; and I have never met with a case in which an old established rule more fitly applies. That rule is that where a decree rests on oral circumstantial evidence, about which different minds might differ, the decree is presumed to be right, and will not be reversed. Our labored discussion for hours in conference over this case, and the nearly equal division of the Court, is evidence that the case is one falling under this rule. In fact, as to this question of actual notice, a majority of the Court fails to find such notice, as the opinion by Judge POFFENBARGER does not rest the decision on such actual notice, but places it on the theory of constructive notice, that

is, that Diller was Terry's agent, and as Diller knew of the right of the Cassiday Fork Boom and Lumber Company, so had Terry notice, not that he had actual notice, but on the legal principle that notice to the agent is notice to the principal. I cannot concur in this. Why? Because the bills do not allege any relation of principal and agent. No such basis for relief is hinted in them. From the relation of principal and agent the opinion deduces the legal proposition that notice to agent is notice to principal; but my understanding is that when you would deduce a legal proposition from facts, those facts must be stated. You cannot make a rule of law flow from facts not pleaded. Moreover, the fact of agency rests on doubtful circumstances, and is not established by that *quantum* of evidence justifying reversal under the rule just stated, of the presumption of correctness of the decree unless clearly wrong.