# CHARLESTON.

SOUTH PENN OIL CO. *et als.* v. BLUE CREEK DEVELOPMENT CO. *et al.*

Submitted February 9, 1916.    Decided February 29, 1916.

1.  VENDOR AND PURCHASER—*Registration of Titles—Execution and Acknowledgment of Deed.*

    To have the effect of constructive notice to subsequent purchasers, a deed must be duly executed and properly acknowledged or proven before it is recorded.    (p. 685).

2.  RECORDS—*Registration of Title—Recordable Paper.*

    A deed containing a certificate of acknowledgment unsigned by the notary, by whom the acknowledgment purports to have been taken, and not otherwise proven, is not a recordable paper.    (p. 685).

3.  VENDOR AND PURCHASER—*Registration of Unrecordable Paper—Effect as Notice.*

    The admission of a deed and an unsigned certificate of acknowledgment thereon to record, by the clerk of the county court, and transcribing it into the record-book, does not constitute such deed a part of the record, so as to affect a subsequent purchaser of the land thereby conveyed with constructive notice thereof.    (p. 685).

4.  EVIDENCE—*Parol—Acknowledgment—Notary's Certificate—Time of Signing.*

    Where, in a suit involving conflicting interests in land, plaintiff introduces in evidence an original deed on which is endorsed the clerk's certificate admitting it and the certificate of acknowledgment thereon to record, such certificate of acknowledgment bearing the notary's signature; and the defendant presents in evidence a copy thereof, attested by the clerk, showing the certificate of the notary to be unsigned, a discrepancy is thereby shown to exist in the documentary evidence of the record, and parol evidence is admissible to determine whether or not the notary's certificate was signed before or after the deed was admitted to record.    Evidence in such case does not collaterally assail the record, but is proper to determine what is the true record.    (p. 691).

5. **VENDOR AND PURCHASER**—*Bona Fide Purchaser—Burden of Proof.*

    He who avers that another purchased with notice of his superior right, has the burden of proving such notice, either actual or constructive; while such other must prove that he is a complete purchaser for a valuable consideration.  (p. 691).

6. **APPEAL AND ERROR**—*Finding of Fact—Evidence.*

    This court will not reverse a finding of fact on conflicting oral testimony, unless such finding is against the clear preponderance of the evidence.  (p. 691).

    (MILLER and LYNCH, JUDGES, dissent.)

Appeal from Circuit Court, Kanawha County.

Suit by the South Penn Oil Company and others against the Blue Creek Development Company and others.  From a decree for defendants, plaintiffs appeal.

*Affirmed.*

*A. B. Fleming, Charles Powell,* and *Kemble White,* for appellants.

*Price, Smith, Spilman & Clay, Maynard F. Stiles,* and *T. S. Clark,* for appellees.

WILLIAMS, PRESIDENT:

This suit in equity was brought by the Blue Creek Coal & Land Company, South Penn Oil Company and United Fuel Gas Company, all corporations, plaintiffs, against the Blue Creek Development Company and the Eureka Pipe Line Company, corporations, and W. W. Brinegar and Nannie Brinegar, his wife, defendants, to have judicially determined the right to the oil and gas under a 50 acre tract of land on Laurel Fork, a tributary to Blue Creek, in Kanawha County. The Blue Creek Development Company is now, and has been for sometime, producing oil from said land, claiming the right to do so under an oil and gas lease executed by W. W. Brinegar and wife to Joseph A. Jones on the 12th of June, 1912, and assigned by him to the Blue Creek Development Company on the 20th of June, 1912.  Both the lease and the assignment of it were recorded on June 21, 1912.  W. W. Brinegar was originally the fee simple owner of the entire interest in said 50 acre tract.  South Penn Oil Company also claims its right from said Brinegar to mine the oil, by

a chain of conveyances and mineral leases, derived from the same grantor, originating in a deed dated December 13, 1901, from W. W. Brinegar and wife to E. T. Crawford and W. P. Stine, conveying "all right to all mineral of any nature whatsoever lying under and upon the surface" of said 50 acre tract and also a tract of 23 acres, with the right to mine the same, the two originally being one tract. The 23 acres is not involved. It is unnecessary to recite the history of plaintiffs' title, and it suffices to say that the Hope Natural Gas Company leased, for oil and gas, from the Blue Creek Coal & Land Company nearly 30,000 acres of land on Blue Creek, including the 50 acres in controversy, and assigned its oil rights to the South Penn Oil Company on June 10, 1908, and its gas rights to the United Fuel Gas Company on June 30, 1910. These assignments were duly recorded prior to Jones' lease of the 50 acres from Brinegar.

Plaintiffs averred that Joseph A. Jones took his lease from Brinegar and wife with full knowledge, both actual and constructive, of plaintiffs' title to the oil and gas, and acquired no right whatever, by virtue of his lease, and prayed that his lease and the assigment thereof to the Blue Creek Development Company be cancelled as constituting a cloud upon their title, and that the Blue Creek Development Company be enjoined from producing, removing and carrying away the oil and gas from said 50 acres, and that defendant, Eureka Pipe Line Company, be also enjoined from delivering to the Blue Creek Development Company any of the oil now being produced by it from said land, and for an accounting for the oil and gas produced and removed. The Blue Creek Development Company answered, averring that Joseph A. Jones acquired his lease from Brinegar in good faith, and without knowledge that plaintiffs claimed any interest in the oil and gas, and averring that it purchased the lease from Jones on June 20, 1912, for the sum of $500.00, and paid him in full by issuing to him twenty shares of its capital stock, fully paid up and non-assessable, of the par value of $25.00 per share. Defendant also averred its ownership of several valuable leases, and contracts for the production of oil and gas, including a leasehold with a gas well thereon then producing about 3,500,000 feet of gas per day, which gas it says

it has since sold to plaintiff, United Fuel Gas Company. Jones is not made a party to the bill.

The cause was heard on the 22nd of February, 1915, on the pleadings and numerous depositions taken on behalf of both plaintiffs and defendants, and a decree entered, holding plaintiffs not entitled to relief and dismissing the bill as to the South Penn Oil Company and the United Fuel Gas Company, and decreeing the Blue Creek Coal & Land Company entitled to the one-eighth, or royalty interest in the funds in the hands of the Eureka Pipe Line Company. The court specifically determined that the certificate of acknowledgment to the deed from W. W. Brinegar and Nannie Brinegar, his wife, to E. T. Crawford and W. P. Stine, dated December 13, 1901, was not signed by F. N. Carr, the notary public named in the body of said certificate, before the deed was admitted to record on the 26th of December, 1901, and was, therefore, not a recordable paper, and was improperly admitted to record, and did not operate as constructive notice to subsequent purchasers from Brinegar and wife, and that Joseph A. Jones had no notice, either actual or constructive, of the rights of plaintiffs to the oil and gas in said 50 acres of land. The court also held that the Blue Creek Development Company was a bona fide and complete purchaser of the lease from Jones, without any knowledge, either actual or constructive, of the claim of plaintiffs. From that decree the South Penn Oil Company and the United Fuel Gas Company have appealed.

The deed from Brinegar and wife to Crawford and Stine was admitted to record by the clerk of the county court of Kanawha on the 26th of December, 1901. But the certificate of acknowledgment, purporting to have been made by Fred N. Carr, notary public, as it appears from the deed book, was not signed by him, and the deed was again admitted to record on July 13, 1912, upon the same certificate of acknowledgment, to which the notary's signature appeared. This second recordation was after the Jones lease was recorded, and gives the Blue Creek Development Company, Jones' assignee, the superior right, unless Jones had notice, actual or constructive, of plaintiffs' prior right. There is no evidence that Jones actually knew of the Crawford and Stine deed, or of

plaintiffs' lease, mediately, thereunder, and, unless he is affected with constructive notice, by virtue of the recordation statute, his right and, the right of his assignee, the Blue Creek Development Company, are superior to plaintiffs. Hence, whether the deed to Crawford and Stine was a recordable paper at the time it was first admitted to record by the clerk of the county court, becomes a vital question in the case; in fact, the determining question. If the notary's certificate was not then signed by him, the deed was not recordable, for its due execution was not proven. It is established law, that the copying into the records of an unrecordable deed is not such a recordation thereof as will affect a subsequent bona fide purchaser of the land thereby conveyed with notice. "The record does not operate as a constructive notice, unless the instrument is duly executed, and properly acknowledged or proved, so as to entitle it to be recorded." 2 Pom. Eq., sec. 652; *Cox* v. *Wyatt,* 26 W. Va. 807; *South Penn Oil Co.* v. *Smith,* 63 W. Va. 587; and *State* v. *Harman,* 57 W. Va. opinion at page 453.

Appellants introduced in evidence the original deed, containing the notary's name signed to his certificate of acknowledgment, and containing the certificate of the clerk of the county court, endorsed thereon, admitting it to record on the 26th of December, 1901, and their counsel insist that the failure of the copy of the deed appearing on the book to show the notary's signature, was the fault of the clerk, or his copyist, in not transcribing the name into the book, and that the notary's name was signed to the certificate, before the deed was first admitted to record. The evidence on this point is very conflicting.

The notary himself testified that, in the fall of 1901, he was employed to prepare deeds and take acknowledgments of the grantors therein, for property purchased by Crawford and Stine, on Blue Creek and Falling Rock; that he wrote nearly all the deeds and took the acknowledgments of the various grantors; that he was at Brinegar's house and took his and his wife's acknowledgment to a deed made by them to Crawford and Stine a short while before Christmas of that year. He was handed the original deed, which contained his signature at the bottom of the certificate of acknowledgment,

and was asked who wrote the name "F. N. Carr" and when it was written, and replied that the whole of the deed and the acknowledgment were in his handwriting; that the only word, not written by him, was the name W. W. Brinegar. Nannie Brinegar signed with her mark, and witness thinks he wrote her name for her. He also says his signature must have been written on the same day that the acknowledgment was taken, namely, on the 23rd day of December, 1901. Because, he says, "this is the first time that I have seen the deed of my knowledge since it was turned over to Mr. Crawford, and I have not been asked at any other time—my attention has not been called to the fact that my signature wasn't there, or anything of that kind, and I take it for granted that I put my signature to it on that date." He furthermore states positively that he did not write the signature there at any time after the 23rd of December, 1901; that he remembers distinctively of returing to Charleston, late on the evening of the 24th of December, in a blinding snow storm which lasted during the whole of his trip from Falling Rock to Charleston; that his impression is he left this deed for Mr. Crawford at Simpson's livery stable, together with one or two others; that he had a team from that stable; that Crawford was in the city that day, but he does not remember whether he saw him or not; that he next saw the deed, after that time, in the city of Washington, about a month before his deposition was taken; that, before he went to Washington, Mr. Clark asked him if he remembered the circumstances connected with his taking the acknowledgment to the deed but he did not then have the deed at his office; that he told Mr. Clark he did remember something about taking the acknowledgment, that, after this conversation, he went to Washington, and sometime thereafter Mr. Clark was in Washington and had the deed with him, and told witness the original deed had been found and showed it to him, and asked him if that was his signature to the certificate of acknowledgment on the deed, and he told him it was. He further says he had not seen the original deed since he turned it over to Mr. Crawford, until that time. His cross-examination discloses a lack of recollection in regard to many circumstances connected with the preparation of the deed and the taking of

77 W. Va.

the acknowledgments thereto. But that is not unusual in view of the long lapse of time. He says he made a number of trips up Blue Creek to take acknowledgments to deeds for Crawford and Stine, and thinks, as a mere guess, he took in all something like fifteen or twenty; that on this particular trip he thinks he took the acknowledgment to two other deeds, one of a Miss or Mrs. Walker, and one other person whose name he did not recollect. He says he prepared the deed in question at Mr. Crawford's commissary on Falling Rock, some days before the acknowledgment was taken, and being asked how long before it was signed, replied as follows: "Some time prior to the date it was signed. We always got the description of the land from their deed and sent it in here, so that Mr. Walter Ashby could examine the title and see that it was all right, and he would send the deed out to have the acknowledgment taken and pay and settle for it." He further says he does not think the title had been examined when he prepared the Brinegar deed; that he had a description of the land when he prepared it, but does not know whether he got it from Brinegar or from Mr. Crawford; that he does not know whether he paid Brinegar for the land at the time he took the acknowledgment or not; that he does not remember whether anything was said at the time the deed was signed, about Mrs. Brinegar not being able to write; nor does he know whether or not he took any acknowledgments for Crawford and Stine, after he took the Brinegar acknowledgment, but thinks it was about the last; that he does not remember whether, when he prepared the deed, he left any blanks in it to be filled or not, but does not think he did; that he went from Charleston to Crawford's commissary on the 23rd of December, and took with him in his vehicle, J. A. Russell, an old man, about eighty years old, but does not remember if Russell was with him at Brinegar's house. Mr. Carr frankly admits that his recollection of the particular incidents of the preparation of the deed and the taking of the acknowledgments of the Brinegars thereto, is not clear. It is hardly to be expected that anyone would be able to remember such minute circumstances for so long a time, and we do not wish to be understood as impugning the sincerity of Mr. Carr's testimony. Yet it is entirely possible that he may be mis-

taken either as to the identity of his signature; or, if it is his genuine signature, as to the time when he signed it. Men are sometimes mistaken as to the identity of their own signature, and it is possible that Mr. Carr's signature may have been forged by a stranger, and he be honestly mistaken as to its genuineness.

E. W. Staunton, who died long before this suit was instituted, was clerk of the county court of Kanawha county at the time the Brinegar deed was first admitted to record. The testimony of his sister Miss Kate S. Staunton and Miss Helen B. Mahan, employees in his office, was taken to prove that the deed appearing on the record book was a literal copy of the original, as it appeared when it was first admitted to record. Miss Staunton testified that, from 1898 up to 1903, she copied the deeds into the deed book with a typewriter; that she copied into the book just what was written in the deed, whether it was written right or wrong; that if there was a blank or omission in any part of a deed she left a corresponding blank space in the copy on the book and put a line under the space to show that she recognized the mistake or omission; that she copied all the deeds appearing in Deed Book No. 85, which is the book containing the Brinegar deed. Her attention was called to a number of deeds in the book, in which spaces were left and dotted lines made with the typewriter, and she explained that those lines indicated that she recognized an omission in the original. She was shown a deed from P. P. Odell to Crawford and Stine, in which the last line of the notary, F. N. Carr's certificate of acknowledgment appeared as follows: ''Given under my hand this —— day of —— 190—'', and also the deed in controversy in which the acknowledgment of W. W. Brinegar and wife, purporting to have been taken by the same notary, to which his signature did not appear at the bottom of the certificate, but in place thereof was a dotted line, and was asked what that dotted line indicated, and she explained that they indicated, that on the original papers there were blanks, and the lines were placed on the book to show that her attention had been especially called to the omission at the time she copied the deed, and that it was not her custom to put a line under the signature when the signature appeared in the original. She

does not remember the particular circumstance of copying the Brinegar deed, but is certain she copied it, and equally positive and certain, that, if the notary's name had been signed to the certificate, it would have been copied into the deed book. She is corroborated by Miss Mahan who testified that she was employed in the clerk's office for three or four years immediately following the latter part of 1900; that she helped Miss Staunton compare the copies of deeds on the book with the originals; that a part of the time one of them would read and then the other, and while one was reading the other would be looking at the original or the copy, as the case might be; that usually Miss Staunton would read from the original and witness would correct the book, if any mistakes had occurred, to make it conform thereto, and would then sign Mr. Staunton's name; that they were very careful, and when a word was left out of the original, they would draw a line or make a dotted line on the book to indicate the omission and show that they had made an exact copy of the original. Miss Mahan identified the name "E. W. Staunton" signed to the clerk's certificate admitting the Brinegar deed to record, as her handwriting, and says it shows she helped to compare that deed with the original. She points out certain small errors in the transcribing of that deed, such as changing the number "11", in the clerk's certificate made to represent the month of November, to "12" to represent December; substituting the character "&" for the word "and"; adding the letter "l" at the end of the word "Laurel", and the letter "r" in "north", as being made in her handwriting on the book to make the copy correspond with the original. She says these mistakes were discovered by comparing the deeds and were corrected before the clerk's name was signed by her to the record. She also corroborated Miss Staunton respecting the appearance of the dotted line on the book in place of the notary's signature. She says: "If Mr. Carr's name had been there we would have signed it with the type-writer and not put the dotted line. The line indicates that his name was not there; we put the dots to show that his name was omitted." She further states that, in making the comparison of the original deed with the record book, it would

not have been possible for them to have overlooked the name F. N. Carr, if it had been on the original.

The original deed was exhibited as evidence in the circuit court and is brought up with the record for our inspection and consideration. The notary's name in the body of the certificate and his signature at the bottom are apparently in the same handwriting, but his signature is evidently written with very much paler ink than any other part of the paper, and apparently with a different pen, the lines being much broader. In view of the facts testified to by Miss Staunton and Miss Mahan, being themselves probative in character, it is highly improbable that they made the mistake. They could hardly have failed to observe the notary's signature, if it had been there when the deed was first admitted to record. If no dotted line had appeared on the book, where the name should have been, their testimony would have been entitled to less weight, neither of them being able to remember the fact of recording this particular deed. But the appearance of the dotted line, and their explanation of its use, together with their testimony relating to corrections made on the book, of figures and words, to make the copy of the paper conform to the original, presenting indisputable proof of an actual comparison made by them after the deed had been recorded, gives to their testimony very great weight. In fact, we scarcely see how such an omission could have been made otherwise than wilfully. The notary's name on the original deed is too plainly written to have escaped the notice of the copyist.

The court's finding on this important fact is, we think, in accordance with the preponderance of evidence. But even if the evidence could be said to be evenly balanced, we would not feel warranted in disturbing the court's finding, in view of the rule, so often announced by this court, giving weight to the chancellor's finding of fact, upon conflicting testimony, which does not clearly preponderate on one side or the other. *Wethered* v. *Conrad*, 73 W. Va. 552; *McGraw* v. *Bower*, 62 W. Va. 417; *Wolfe* v. *Bank*, 54 W. Va. 689; and *Weaver* v. *Akin*, 48 W. Va. 456.

But counsel for appellants insist that the original deed, bearing the clerk's certificate admitting it to record, and

being on its face complete in all respects, is itself the record importing a verity, and is not subject to collateral attack. The original deed with the clerk's certificate is not the record but only evidence of the record, nor is it exclusive evidence of it; the record book, or a certified copy from it, is also evidence to prove the record. The original deed, in this instance, does not conform to the book, which purports to be an exact copy of it, officially made. The ·statute makes a certified copy evidence as well as the original. Sec. 5, Ch. 130. The documentary evidence of the record is itself conflicting, and the question presented is, what is the true record? Is it the original deed as it now appears, with the notary's signature to his certificate, or is it the copy of the deed as it appears on the record book, without the notary's signature? To determine this question it is necessary to resort to evidence outside of the record. There is evidence tending to prove that the notary's name was not signed to his certificate when the deed was first recorded, and, if it was not, it necessarily follows that it was placed there after the deed was admitted to record. For the purpose of illustration let us suppose it was, in fact, written on the original after it was recorded. It would then be a false record; and it will certainly not be seriously contended that evidence would not be admissible to prove the fact in order to discredit the recordability of the deed. To hold otherwise would be a reproach to our jurisprudence, as was said by Judge Tucker in *Bias* v. *Floyd, Governor,* 7 Leigh 640. In that case a recognizance had been materially changed, by interlineations made by the justice, after it had been ·signed by the principal and his sureties; and the *scire facias* upon the recognizance described it as if the interlined words had formed a part of it originally. It was held, that upon a rule for the purpose, the recognizance might be amended by striking out the interlined matter, and a plea of nul tiel record entered to the *scire facias.* Quoting from the opinion of that distinguished jurist, at page 646: "It would be a reproach to the jurisprudence of any country, if a material alteration in an obligation however solemn, or even in the records of the court itself, to the prejudice of a party, could be in no wise corrected. In this case the parties entered into a recognizance, which would have been void

if it had remained unaltered. It is changed; it is never reacknowledged by them after the change, and the principal does not even know of the change. It is impossible to consider them as bound by the instrument in its present form."

This court, speaking by Judge GREEN, in *State* v. *Vest*, 21 W. Va. 800, discussing the rule respecting the absolute verity of a record, says: "Whatever therefore on the face of a book of record has been duly authenticated by the signature of the judge, must be held to be an absolute verity, and it cannot be contradicted; and so also any paper actually referred to on the record-book as filed or as constituting a part of the record is to be regarded as a part of the record, and is as much a verity as if it had been spread out at length as a part of the record. But it is only that which was actually on the record-book, when thus authenticated or that is actually contained in some paper so made a part of the record by reference, that is thus held to be an absolute verity. And therefore if after a record is made up and duly authenticated by the signature of the judge, any addition is made to such record fraudulently by any interlineation made by another, this false and fraudulent interlineation constitutes in fact no part of the record, and evidence introduced to prove, that such interlineation was falsely and fraudulently made by one not authorized to make the same, is really not an impeachment of the verity of the record, but is simply proving, that such fraudulent interlineation was really never a part of the record. The absolute verity attributed to a record cannot be used to give sanction to a forgery or to a fraudulent erasure of the record."

The two cases above cited are followed in *Harring* v. *Lee*, 22 W. Va. 621, and the doctrine reiterated. In his opinion in that case, Judge SNYDER, at page 672, says: "If a record is interlined or erased by some unauthorized person such alteration constitutes no part of the record and it may be assailed by parol testimony. This is not controverting the absolute verity of the record, but it is simply enquiring what really constitutes the record. If this were not allowed, the absolute verity attributed to a record could be used to give sanction to a forgery or fraudulent erasure of the record."

The question here presented does not differ in principle

from that of an interlineation made on the face of the record. If the notary's name was not signed to his certificate when the deed was first recorded, it was a material alteration of the record to write it there afterwards, whether upon the original deed or in the deed book; and the omission of the name from the record book, where it should have appeared, if it was then in fact on the original, renders uncertain what is the true record, and justifies the introduction of oral evidence to determine the fact. To insist that to do so would be to attack collaterally the record, is to beg the question; for it assumes that the original deed in its present form and without regard to any material alteration that may have been made in it, since its recordation, is conclusive proof of the record. It is not more conclusive than the record book itself. The two should coincide; if they do not, the discrepancy must be explained before the true record can be ascertained. The situation is this: plaintiffs offer the original to prove that it was a recordable instrument and was properly recorded, and therefore constructive notice of their rights to subsequent purchasers of the property; and defendant offers a certified copy of it from the records in the clerk's office, to prove that it was not a recordable instrument and, therefore, not constructive notice to it. Here, then, is presented a conflict in the documentary evidence, a discrepancy in the record itself; and the court is bound to decide what is the true record before it can determine the rights of the respective parties.

In *Burnett* v. *Young*, 107 Va. 184, it was held in an action of ejectment, that it was permissible to prove that a scroll had been affixed, by way of a seal, to both the original paper and also to the copy on the records in the clerk's office, after the paper had been duly acknowledged and recorded. The opinion in that case cites authorities from a number of the states, including our own case of *Herring* v. *Lee, supra,* supporting the proposition. Evidence in such case does not impeach the record, but is admissible for the purpose of ascertaining what the record really is. If the signature of the notary had been on the original paper when it was first recorded, the record would have been complete and the grantee would no doubt be protected, notwithstanding the recorder

had failed to copy the signature into the record book. *Wethered* v. *Conrad*, 73 W. Va. 551. In such case the grantee would have done all that was required of him by presenting to the clerk, at his office, a recordable paper and causing it to be admitted to record by him; and it would have been a recorded paper from that time and plaintiffs would have been protected. But the fact, as the court below found, and, we think, correctly, is that the paper was not recordable.

Having alleged that defendant was a purchaser with notice, the burden was on plaintiffs to prove the allegation. They have not done so. *Cassiday Fork Boom & Lumber Co.* v. *Terry*, 69 W. Va. 572; and 13 Ency. Dig. Va. & W. Va., 602. There is no proof whatever that either Jones, who took the lease from Brinegar, or G. N. Hancock, who acted for the Blue Creek Development Company in purchasing his lease, had any actual knowledge of plaintiffs' right. On the other hand, defendant has fully proven that it is a complete purchaser of the Jones lease for value.

The deed from W. W. Brinegar and wife to Crawford and Stine, conveying all the minerals in the land, was good as between the parties thereto, whether recorded or not. It passed title to the oil and gas, as well as all other minerals, to the grantees and estops Brinegar to claim the right to the royalty oil; that belongs to the Blue Creek Coal & Land Company, which has the title to the minerals in place. The court below properly so held.

The decree is affirmed.

*Affirmed.*