# Wytheville

HOWARD BOONE v. LUCY JACKSON SCOTT.

June 11, 1936.

Present, Holt, Hudgins, Gregory, Chinn and Eggleston, JJ.

The opinion states the case.

*J. Winston Read* and *H. Clay Midgett,* for the appellant.

*Nelms & Colonna,* for the appellee.

HUDGINS, J., delivered the opinion of the court.

The object of this suit is to correct an alleged mutual mistake in the description of a certain tract of land conveyed by deed, bearing date July 9, 1924, from Lucy Jackson Scott to Howard Boone. From a decree reforming the deed according to the prayer of the bill, this appeal was allowed.

On July 29, 1872, A. L. Parker, and wife, conveyed to Raleigh Chaney a certain parcel of land lying in Elizabeth City County described as follows: "That certain piece or parcel of land, containing two and a half acres, situated in the county of Elizabeth City and bounded as follows: viz.: On the north by the main road, on the east by George Freeman and Bates, on the south by Bates, on the west by Richmond Gray * * *."

On May 10, 1895, Raleigh Chaney conveyed to his son, James Chaney, a lot fronting 51 feet on the main road, extending back 110 feet, being the extreme western part of the two and one-half (2½) acres purchased from A. L. Parker. Sometime in 1909, Raleigh Chaney died

testate. The pertinent paragraphs of his will are as follows: "Third: I give to my son William Chaney a lot of land fronting on the main road 50 feet and running back therefrom 150 feet, between parallel lines and adjoining the lot that I have conveyed to my son James Chaney.

"Fifth: I give to my said daughter, Lucy Chaney, all of the property of which I may die seized and possessed, not hereinbefore disposed of, whether the same be real, personal or mixed, in fee simple to be used and disposed of as she may think proper."

On opposite page is a rough sketch of the two and one-half acre tract conveyed to Raleigh Chaney, showing lot A conveyed to his son, James; lot B devised to his son, William, and the residuum, lot C, devised to his daughter, Lucy Chaney, who subsequently married Jackson Scott.

James Chaney died intestate, leaving a widow, Fanny Chaney, and an infant son, William Chaney II, who died in 1921 under 21 years of age. The widow of James Chaney married one Booth, and continued to live in the house erected by James, on lot A, and with the consent of the owners, used lot B as a garden. After James' death, and while her son, William Chaney, II, was living, she obtained an order of court to borrow money for the purpose of making improvements on the lot.

In 1924 Lucy Jackson Scott, nee Chaney, sought to borrow $75 from A. L. Powell, a member of a real estate firm in Newport News. At his request she delivered to him the old deed from A. L. Parker, and her father's will, which was dated July 15, 1898, but had not been admitted to probate. Mr. Powell lent her the money, took a deed of trust on the land to secure its payment, and recorded this trust deed June 23, 1924. On the same date the will was probated. A few days later Powell informed Lucy Jackson Scott that he knew a party who desired to buy her land. She agreed to accept $300 for the land devised her by her father, and when Mr. Powell asked her to sign the deed bearing date July 9, 1924, she, without reading, signed and acknowledged it, trusting and believing that

GRAY

CANAL FLOWS TO RIVER

DITCH

PARCEL "A"

Conveyed to James
Contains Valuable
Residences

PARCEL "B"

Devised to WILLIAM

173.0'

51'

50'

To Newport News

Bridge

Bridge

Rt. of Way

Powhatan Ave.

PARCEL "C"

DEVISED to Lucy.
and by her sold
to Howard Boone
1924

Large Ditch

Old Salters Creek County Road

PHILLIPS

Bates
(City Tract)

S
W
N
E

Freeman

To Hampton

Subdivision of Map on P61 of
Appellant's Petition —Filed with
Appellee's Reply Brief

Mr. Powell had incorporated in the deed a correct description of lot C. As a matter of fact, the description stated in this deed was exactly the same as the one found in the deed of 1872, from A. L. Parker to Raleigh Chaney. No mention was made of the fact that parts of this land had been previously conveyed and devised to other parties.

Sometime after the deed had been delivered Lucy Jackson Scott saw Howard Boone, the purchaser, on the property, and pointed out to him the fence which was on the boundary line, between lot C and lot B. Boone seemed to recognize this fence as the western boundary of the land she had conveyed to him.

Lucy Jackson Scott also stated that she did not know that Howard Boone claimed any interest in lot A until 1933, when she was informed that he had taken possession of this lot immediately after the death of Fanny Booth. She then told him that he had no right to lots A and B; that her father had conveyed one of these lots by deed to her brother, James, and devised the other lot to her brother, William. On Boone's refusal to surrender possession of the property, she sought the advice of counsel, who instituted this suit for her.

Howard Boone contends that there was no mutual mistake, and that he is entitled to all the land described in the deed to him. This claim includes lot B as well as lot A. He further contends that by Code, section 5272, on the death, in 1921, of William Chaney, II, the infant son of James Chaney, title to lot A passed to Lucy Jackson Scott, the sister of James Chaney, to the exclusion of James Chaney's mother, Marinda Thigpen, who was then living, and the children of a deceased brother, William Chaney.

In view of the clear-cut and positive testimony of Lucy Jackson Scott to the effect that there was a mistake in the description of the land, and Howard Boone's present denial of that fact, we again review the evidence to ascertain, if possible, just what land he intended to acquire

when he accepted the deed of July 9, 1924. Unfortunately Mr. A. L. Powell, who prepared this deed, and on whom both parties relied in closing the sale, died before the institution of this suit. Boone testified that in 1924 he desired to purchase a few acres in this vicinity for the purpose of farming in a small way; that he made inquiries of several real estate agents, and finally talked with Mr. Powell about such a purchase, and that sometime later Mr. Powell showed him the land in question. At the time there were no buildings or improvements on lot C. Lots A and B were enclosed by a fence. Fanny Booth and her family were living in the house erected on lot A and cultivating lot B. The proven market value of lot C was $300, the amount paid by Boone. The market value of lots A and B, with the improvements thereon was stated to be in excess of $1,500. While the purchase price paid by Boone is not decisive of the case, it is a bit of pertinent evidence to be weighed with other facts and circumstances proven.

Boone said that on receiving his deed he examined the boundaries stated therein, and found that his land was bounded on the west by the lands of Richmond Gray, and that Fanny Booth was occupying lots A and B, which property, as shown from the sketch, lies between the western boundary of lot C and the property of Richmond Gray. He claims to have informed Fanny Booth that he had purchased the property and she must vacate. Fanny Booth told him he had acquired no right to the property, and continued to occupy and use both lots A and B until her death in 1933.

The deed to Boone contains the usual covenants of general warranty. Notwithstanding the fact that on delivery to him of the deed, he was entitled to immediate possession of all the land he had purchased, or damages for breach of covenant, he made no other attempt to take possession of either lot A or B, until nine years later. Nor did he make any complaint to Mr. Powell, or his grantor, for failure to deliver possession of all the land

purchased by him. He states that he delayed taking possession of lots A and B because of the rights of the life tenant. There was no life tenant. Fanny Booth, as the surviving wife of James Chaney, owned a dower right in lot A which had never been assigned. She had no right at all in lot B. This conduct of Boone is inconsistent with his testimony.

While Boone was on the stand he repeatedly stated that he was entitled to lot B as well as lot A. His counsel in the lower court, who was not his attorney in this court, stated his claim to lot B thus: "We should like it be of record that defendant maintains the ground that he has intended all along that provided it is shown that William Chaney left legitimate children. There is no disposition on the part of the defendant to claim any portion of the property that was devised to William Chaney by his father, Raleigh Chaney."

It is not denied that four children of William Chaney were living at the time the testimony was taken in the case. The same instrument under which Howard Boone's grantor acquired the land, in paragraph No. 3, in express terms, states that a part of this parcel had been conveyed to James Chaney, and a part devised to William Chaney. Specific reference to this will was made in an abstract of title to the property prepared for Howard Boone by his attorney, and bearing date of July 11, 1924. If he did not have actual knowledge of these facts, he is charged with constructive notice of them. Under the facts stated it is inconceivable that Lucy Jackson Scott intended to include in the conveyance to Howard Boone that part of the land which had been devised to her brother, William Chaney, or that Howard Boone intended to purchase it.

It seems that in 1927 Howard Boone filed suit against Fanny Booth for the purpose of obtaining a mandatory injunction against her, to permit him to open and maintain a drainage ditch along the northern boundaries of lots A and B and the eastern boundary of lot B. The bill

in the case was signed and sworn to by Howard Boone. Among the allegations in the bill are the following: "That the said Raleigh Chaney died about the year 1917, leaving one portion of the said tract, the land now owned by Howard Boone, to his daughter, Lucy Chaney, who sold the same in 1924 to Howard Boone, that the other portion, being the land now owned by Fanny Booth, descended to a grandson, who subsequently died leaving as his sole heir at law his mother, Fanny Booth. * * * That Raleigh Chaney while seized and possessed of the lands now owned by Howard Boone and Fanny Booth joined with other land owners about 50 years ago in constructing a drainage ditch for the purpose of draining their lands. That the said ditch, hereinafter called the back ditch, was dug from a point about 500 yards east of the land now owned by Howard Boone, and thence extending west, running along the southerly boundary line of the land now owned by Fanny Booth, connecting with a ditch running southward into Hampton Roads.

"That in September, 1927, Benson Phillips Company, Incorporated, purchased from Howard Boone a right of way in a ten foot strip of land adjacent to the land of Fanny Booth for the purpose of having an outlet from the said county road."

The uncontradicted evidence in the case under consideration shows that the ditch referred to in the former suit ran along the county road on the side of lots A and B, and that the ten foot right of way mentioned ran along the eastern side of lot B. Howard Boone testified in his own behalf in the injunction suit, and when asked to give the boundaries of the land he had bought from Lucy Jackson Scott, stated that it was adjacent to the land of Fanny Booth and that one ditch was on the western boundary of his land, and on the eastern boundary of Fanny Booth's land. He was asked the following question: "Why don't you answer as to whether you join the land of Fanny Booth, you do know, don't you?"

To this he made the following answer: "That piece of

land exactly between Fanny Booth and me is owned by her niece and nephew, she uses it as a garden according to the statement of Lucy Chaney, the one from whom I purchased my land."

Other witnesses testified in the case, among them Lucy Jackson Scott. From this testimony, extracts from which are filed in this case, it clearly appears that Howard Boone, and numerous other people living in the community, knew that the two and one-half acres owned by Raleigh Chaney had been divided in three parts, and one part conveyed, or devised, to each of his three children. Final decree in the case was entered June 14, 1929, giving Howard Boone substantially the rights prayed for in his bill. The evidence in that case, emanating from Howard Boone himself, is conclusive of the fact that as late as 1929 he had no intention of claiming under his deed from Lucy Jackson Scott, any other land than that devised to her by her father, Raleigh Chaney. "In cases of plain mistake or misapprehension, though not the effect of fraud or contrivance, equity will rescind the conveyance, if the error goes essentially to the substance of the contract, so that the purchaser does not get what he bargained for, or the vendor sells that which he did not design to sell." 4 Minor's Institutes (4th Ed.) 697.

In *Lee* v. *Laprade et als.,* 106 Va. 594, 56 S. E. 719, 117 Am. St. Rep. 1021, 10 Ann. Cas. 303, it was held that a court of equity had jurisdiction to rescind a deed for a plain mistake which was material in its character and of the very substance of the transaction. In that case the lot conveyed was a part of the public street. See *Virginia Iron, etc., Co.* v. *Graham,* 124 Va. 692, 98 S. E. 659.

In the case under consideration, the evidence not only shows that a substantial mistake was made in the description of the land, but that the evidence emanating from the grantee in a former litigation concerning the same subject matter, clearly and satisfactorily points out the specific land which the purchaser intended to acquire when he made the purchase. If reformation of the in-

strument is denied in the case presented, the grantee will obtain a larger and different estate than that which he intended to acquire, and the grantor will be forced to dispose of a right in an estate which she did not intend to sell. In other words the subject matter of the sale and purchase, was the land embraced in lot C and none other. When such a state of facts has been proved by clear, cogent and satisfactory evidence, equity should, and will reform the instrument to make it conform to the real intent of the parties at the time it was executed. See Williston on Contracts (2d Ed.), vol. 3, p. 2750.

Having reached this positive and definite conclusion, there is no necessity for the court to decide who were, or are the heirs of William Chaney, II, who died before reaching his majority.

The decree of the lower court is affirmed.

*Affirmed.*