C. I. JOHNSTON *et al. v.* FLOETTA TERRY *et al.*

(No. 9692)

Submitted September 11, 1945.　Decided November 6, 1945.

*Randolph Bias,* for appellants.
*Walter G. Burton* and *Ajax T. Smith,* for appellees.

Fox, Judge:

C. I. Johnston and Savannah H. Johnston, his wife, instituted their suit in the Circuit Court of Mercer County, praying that their deed to W. B. Ramsey, Jr., and Ozella Ramsey, dated August 13, 1936, be reformed to the extent only of excluding therefrom a tract of 7.73 acres of land, known as the "mill lot", which tract of land was covered by the description contained in said deed, an allegedly conveyed, by mutual mistake of the parties, and through the mistake of the scrivener who prepared the deed aforesaid. From a decree of said court, grant-

ing the relief prayed for, as to said deed, and a subsequent deed from the Ramseys to Floetta Terry, the defendants, Floetta Terry, W. B. Ramsey, Jr., and Ozella Ramsey prosecute this appeal.

On June 8, 1936, by deed referred to in the record, but not a part thereof, the First National Bank of Narrows, Virginia, conveyed to C. I. Johnston several tracts of land, one of which was known as a tract of 200 acres situate on East River in Mercer County. On July 29, 1936, Johnston and his wife conveyed to C. H. Lankford and Mamie Lankford, his wife, two parcels of land, one described as eight acres and the other as four acres, which deed was promptly recorded. A subsequent survey of the tract described therein as eight acres discloses that the actual acreage thereof is 7.73 acres. At the date of the conveyance to the Lankfords, a water-power grain mill was located on the 7.73 acres, and the milldam on East River, from which water power was procured, was situated on the adjoining four-acre tract. Shortly after this conveyance, one W. E. White, now deceased, the father of the defendants below, Floetta Terry and Ozella Ramsey, negotiated with Johnston for the purchase of a two hundred-acre tract of land, lying on the south side of East River, and on both sides of the Norfolk and Western Railway right of way. White had been the former owner of the two hundred acres, of which it is contended the mill lot was a part, and the four acres, and for a long time had operated the mill above referred to. He had met with financial reverses, and was not in position to take title to any property in his own name; but he did secure an agreement from Johnston to sell the two hundred acres at a price of twelve hundred fifty dollars, payable partly in cash and a substantial balance to be represented by notes to be secured by a deed of trust on the land conveyed. It was further suggested that the land be conveyed to a son of W. E. White, but discussion revealing that the son had not then reached the age of twenty-one years, and by reason of that fact could not properly execute a deed of trust, as

contemplated, that plan was abandoned. White induced Johnston to cause his attorney, now deceased, to prepare a deed for the land he was purchasing, by which said land was to be conveyed to W. B. Ramsey, Jr., and Ozella Ramsey, son-in-law and daughter of White. Neither Ramsey nor his wife had anything to do with the negotiations leading up to the conveyance afterwards made to them by Johnston. On August 13, 1936, Ramsey and his wife were induced by White to go to Princeton for the supposed purpose of witnessing some papers, and when they arrived at Princeton and the office of Johnston's attorney, they found what White really wanted was to secure their consent to taking title in their names to the two hundred-acre tract of land he had arranged to purchase from Johnston. W. B. Ramsey, Jr., objected to this plan, whereupon a conference was had outside the attorney's office between Johnston, White and Ramsey, in which Ramsey finally agreed to take title to the land in question. Thereupon Johnston and his wife executed the deed, Ramsey and his wife executed the purchase money notes, and a deed of trust securing the same, and the transaction was closed. The conveyance made by Johnston and his wife was by a deed with a covenant of general warranty, from which we quote the following paragraph:

"For all of which said consideration the said parties of the first part *doth* bargain and sell, grant and by these presents convey unto the said parties of the second part with covenants of general warranty of title all of a tract of 200 acres more or less, of real estate lying in the district of East River Mercer County, West Virginia, and on the waters of East River which 200 acres more or less is a portion of the lands conveyed to the said C. I. Johnston, male grantor herein by First National Bank of Narrows, a corporation, by deed bearing date the 8th day of June 1936 and of record in the county court clerk's office of Mercer county in Deed Book No. 226 page 503, which said 200 acres of land herein conveyed is bounded on the south by the lands of L. E. White, et als; on the east by the lands

of Green Brinkley and the Burton lands; on the north by East River and on the west by the lands of W. T. White and Fanny Brown, and which 200 acres comprise all the lands so conveyed by said deed to C. I. Johnston which lie south of East River and east of the lands of W. T. White and Fanny Brown."

It is admitted by the parties that the description quoted above covers the 7.73 acres known as the mill lot now in controversy.

Following the deed from Johnston to the Lankfords, and on July 30, 1936, Lankford and his wife conveyed to Leslie E. Gadd, Trustee, the two tracts described as eight and four acres, to secure to Johnston the payment of the sum of twenty-seven hundred dollars, being a part of the purchase money for said land so conveyed by Johnston to the Lankfords. The Lankfords defaulted in the payment of the notes secured by the deed of trust, and Gadd, as trustee, sold said lands at public auction, Johnston becoming the purchaser thereof, and the said two tracts of land were conveyed to him by said trustee by deed dated October 7, 1937, by which the title to both of said tracts of land became re-vested in Johnston. The evidence is clear and convincing that, from the time of the conveyance of the two lots of land aforesaid to Lankford to the date of the institution of this suit, Lankford and C. I. Johnston had actual, continuous possession of the 7.73 acres, as well as the 4-acre tract adjoining; that neither Ramsey, his wife, nor the defendant Terry ever at any time had possession thereof; and that not until early in 1942, and after the death of W. E. White, was any question ever raised as to the ownership of the 7.73 acres of land in question. On March 21, 1942, W. B. Ramsey, Jr., and Ozella Ramsey, by deed without warranty, conveyed to the defendant, Floetta Terry, the real estate which had been conveyed to them by Johnston by the deed of August 13, 1936, and shortly thereafter, as will be hereafter noted, a question arose as to the ownership of the 7.73 acres. The defendant Terry, acting

through her husband as her agent, and with the assistance of an attorney then took up with Johnston the question of the ownership of this property, and attempted to secure a settlement of the dispute, and, being unsuccessful, threatened suit to effect such settlement. Thereupon Johnston and his wife instituted this suit, seeking to reform the deed of August 13, 1936, so as to make the description of the land in question conform to what they say was the intention and purpose of all parties thereto, and to correct a mutual mistake between the parties to said suit, and a mistake of the scrivener in preparing the deed.

The bill sets up the facts noted above, and avers that at the date of the execution of the deed of August 13, 1936, both Ramsey and his wife knew that the mill lot, the 7.73 acres, was not intended to be included in the sale and conveyance to them, and that the same had been theretofore sold to the Lankfords; that the deed executed by Johnston to the Lankfords had been prepared some fifteen days prior thereto by Johnston's attorney, the same attorney who prepared the deed from Johnston to the Ramseys; and that in preparing the deed to the Ramseys said attorney made the mistake of not excepting therefrom the 7.73 acres theretofore conveyed to the Lankfords. In short, it is averred, in effect, that all of the parties to the transaction, and the scrivener, knew, and understood that the 7.73-acre tract was not being conveyed, and that it had theretofore been conveyed to the Lankfords; and therefore a mistake was made by the scrivener in not excepting the same from the deed, and a mutual mistake resulted therefrom on the part of the grantors and the grantees therein in executing and accepting delivery of said deed without such exception or reservation, and on these grounds is based the prayer of the plaintiffs for the reformation of the deed to the Ramseys.

The defendants filed their joint and several answer and cross bill, in which they deny that any mistake was made. They say that the Ramseys accepted delivery of

the deed of August 13, 1936, in the belief that it was intended to convey to them all the land described therein; that they had no notice or knowledge that any part of said land had been conveyed to the Lankfords. The defendant, Floetta Terry, also avers, in the same answer and crossbill, that when she acquired title to said land, under the conveyance from the Ramseys, on March 21, 1942, she understood and believed that she was acquiring title to the whole of said tract of two hundred acres, including the mill lot; and that at no time prior to the said deed did she know of the conveyance to the Lankfords, or the execution of the trust deed by the Lankfords; and that she was an innocent purchaser for value of the land in question. The defendants asked that the relief prayed by the plaintiffs be denied, and as affirmative relief to themselves that the deed made by Johnston to the Lankfords, dated July 29, 1936, and the deed from Leslie E. Gadd, Trustee, to Johnston, dated October 7, 1937, be set aside, vacated, and held for naught, as clouds upon the title to the land claimed by the defendant, Floetta Terry, including the 7.73 acres in controversy.

As we understand this case, the position of the plaintiffs may be stated as follows: (1) That the mill lot in question, ascertained to consist of 7.73 acres, was not intended by the plaintiffs to be conveyed nor intended by the Ramseys to be purchased; (2) that the Ramseys were advised at the date of the conveyance to them that the mill lot was not intended to be included, and that the same had been sold to the Lankfords, and that they admitted knowledge of that fact; and (3) that the mutual mistake on the part of the parties to the said conveyance, and the mistake of the scrivener in preparing the deed without excepting the 7.73 acres aforesaid, create a situation where it is proper for a court of equity to decree reformation of said deed to the Ramseys so as to make it conform to the intention of the parties thereto. On the other hand, the position of the defendants, the Ramseys, is (1) that there was no mutual mistake as between the parties to the conveyance of August 13,

1936, and that they accepted said deed in the belief that they were securing title to all of the lands embraced therein, including the 7.73 acres; (2) that at that time they had no knowledge of the execution of the deed to the Lankfords; and (3) that while the deed from Johnston to the Lankfords vested in the latter superior title to the 7.73 acres, when Johnston reacquired title to said tract of land, under the deed from Gadd, Trustee, he thereby became estopped to assert the title thus acquired as against his conveyance to the Ramseys. The defendant, Floetta Terry, relies upon the contentions made by the Ramseys aforesaid, and on her part further says that she became the owner of the lands in question, under her deed from the Ramseys, without notice or knowledge of any claim thereto by Johnston, and that she was an innocent purchaser for value without notice of any such claim; and that even if it be held that there was a mutual mistake in the execution of the deed of August 13, 1936, as between the Johnstons and the Ramseys, she, as such innocent purchaser for value, is not chargeable therewith, and there can be no reformation of said deed to her prejudice.

There can be no doubt that equity has jurisdiction to reform a deed executed through a mutual mistake of the parties so as to make it embrace the actual contract intended to be made between them. *Melott* v. *West*, 76 W. Va. 739, 86 S. E. 759. "Equity may reform a deed or contract where by fraud, accident or mistake of the scrivener, or by any other means, the same does not conform to the actual agreement of the parties." *Hertzog* v. *Riley*, 71 W. Va. 651, 77 S. E. 138. See also *Pickens* v. *Pickens*, 72 W. Va. 50, 77 S. E. 365; *Hanly* v. *Harmison*, 89 W. Va. 608, 109 S.E. 742; *Boone* v. *Scott*, 166 Va. 644, 187 S.E. 432. But the proof necessary to justify a court in decreeing such reformation must be strong, clear and convincing. *Fishack* v. *Ball*, 34 W. Va. 644, 12 S. E. 856; *Robinson* v. *Braiden*, 44 W. Va. 183, 28 S.E. 798; *Smith* v. *Owens*, 63 W. Va. 60, 59 S.E. 762; *Crim* v. *O'Brien*, 69 W. Va. 754, 73 S.E. 271; *Stevens* v. *John-*

*son,* 72 W. Va. 434, 78 S.E. 377; *Melott v. West, supra; Watson-Loy Coal Co.* v. *Monroe Coal Mining Co.,* 85 W. Va. 645, 102 S.E. 485; *Hanly* v. *Harmison, supra; Boone* v. *Scott, supra.* Parol evidence may be accepted to justify the reformation of a deed for mutual mistake or fraud, and, necessarily for a mistake on the part of a scrivener. *Nichols* v. *Cooper,* 2 W. Va. 347; *Troll* v. *Carter,* 15 W. Va. 567; *Allen* v. *Yeater,* 17 W. Va. 128; *Creigh's Admr.* v. *Boggs,* 19 W. Va. 240; *Deitz* v. *Insurance Co.,* 33 W. Va. 526, 541, 11 S.E. 50; *Fishack* v. *Ball, supra.* See also 5 Pomeroy Equity Jurisprudence, 2d Ed. 4739; 32 C.J.S. 938. But there can be no reformation of a deed for mutual mistake of the parties, or a mistake of the scrivener, where such reformation would operate to prejudice the rights of one who claims the land as an innocent purchaser for value. *Robinson* v. *Braiden, supra; Lough* v. *Michael,* 37 W. Va. 679, 17 S. E. 181, 470; *Stickley* v. *Thorn,* 87 W. Va. 673, 106 S. E. 240; and 5 Pomeroy Equity Jurisprudence, 2d Ed. 4738; 44 A.L.R. 78; 45 Am. Jur. 624; and *Snyder* v. *Grandstaff,* 96 Va. 473, 31 S.E. 647.

Another legal question involved herein grows out of the reacquistion of the title to the 7.73 acres by Johnston, subsequent to the deed to the Ramseys, dated August 13, 1936. For one reason or another, all authorities agree upon the fundamental proposition that where a person conveys land by deed of general warranty, and has at that time no title, or a defective title thereto, and thereafter acquires perfect title, he is estopped to assert th title thus acquired against his former conveyanc 8 R.C. L. 1058; 10 R.C. L. 677; 2 Devlin on Deeds, 3. Ed. 1764; 3 *Id.* 2392; 3 Washburn on Real Estate, 6th Ed. 98; Minor on Real Property, 2d Ed., 1689; 19 Am. Jur. 610; *Mitchell* v. *Petty,* 2 W. Va. 470; *Buford* v. *Adair,* 43 W. Va. 211, 27 S.E. 260; *Clark, Trustee* v. *Sayers & Lambert,* 55 W. Va. 512, 47 S.E. 312; *Summerfield* v. *White,* 54 W. Va. 311, 46 S.E. 154; 16 Am. Jur. 629; *Yock* v. *Mann,* 57 W. Va. 187, 49 S. E. 1019; *Blake* v. *O'Neal,* 63 W. Va. 483, 61 S.E. 410; *Irvin* v. *Stover,*

67 W. Va. 356, 67 S.E. 1119; *Custer* v. *Hall*, 71 W. Va. 119, 76 S.E. 183. The defendants rely upon these authorities to support their claim that while admittedly the Lankfords, under their prior deed, had good title to the 7.73 acres in question, when they lost that title, and the same became re-vested in Johnston under the deed from Gadd, Trustee, such after-acquired title in Johnston became vested in the Ramseys at that time, and later in Terry as grantee of the Ramseys.

In this connection, it is claimed that if there was, in fact, no mutual mistake in the deed from Johnston to the Ramseys, and although Johnston at that time had no title to the 7.73 acres, his after-acquired title inured, through estoppel, to the benefit of the Ramseys. This would be true in such a case. But if there was, in fact, a mutual mistake, in the execution of said deed, and it was never intended by any of the parties that title to the 7.73 acres should pass to the Ramseys, then the theory of estoppel does not apply, because it was never intended to convey that tract. If the deed be now reformed to exclude that tract from the conveyance, that exclusion relates back to the date of the deed, and no estoppel could thereafter be created as to land not intended to be conveyed. This proposition, however, does not apply to a purchaser for value without notice.

Having stated the law governing this case, we come to the question of whether there was a mutual mistake between the parties, and a mistake on the part of the scrivener, in the preparation and execution of the deed from Johnston and his wife to the Ramseys, on August 13, 1936. The testimony on this point is in direct conflict. The deed was executed in the office of Johnston's attorney, now deceased. There were present at that time Johnston and, at least a part of the time, his wife, and his daughter, Mary Johnston Davis, the two Ramseys, and the attorney and W. E. White. Mrs. Johnston did not testify, there being some contention that she was not in a position to hear the conversations then had, although her failure to testify is criticized by the defend-

ants. All persons then present are now living, except W. E. White and the attorney. Johnston testified that prior to the time the deed was executed and the transaction closed, he told Ramsey, in the presence of Ramsey's wife, that the mill lot was not being sold, and had been sold to the Lankfords, and that Ramsey said he knew that to be true, or words to that effect. Johnston is corroborated in this statement by the testimony of his daughter. On the other hand, both Ramsey and his wife testified that no such statement was ever made by Johnston, and that they had no knowledge that the mill lot had been theretofore conveyed to Lankford, and that they accepted delivery of the said deed, executed the notes, and a trust deed securing the same, with the understanding that they were acquiring title to all the land described in said deed. We therefore have the testimony of four witnesses, two on one side of the proposition and two on the other, the integrity of none of whom is impeached, and all of whom are to some extent interested in the result of this suit. Standing alone, under the well-settled rule that to secure reformation of a written instrument the evidence relied upon to sustain such reformation must be clear and convincing, we do not think this testimony sustains the burden of proof which the plaintiffs must carry on that issue; and if there were no other circumstances in the case supporting plaintiffs' contentions, we would be impelled to hold that plaintiffs had failed to sustain the burden of proof on this vital issue.

But there are other circumstances in the case, clearly developed by the record, which, to our mind, have an important bearing upon this issue. As noted above, the negotiations leading up to the execution of the deed from the Johnstons to the Ramseys were conducted by W. E. White on the one hand and Johnston on the other. Soon after this deed was executed, the Ramseys removed from the State, and, except for occasional visits to the Whites' home, have so far as the record discloses, been absent ever since; that defendant Terry has only been in that

community occasionally since the deed of August 13, 1936, was made; and all of the defendants say that the actual possession and management of the land conveyed by Johnston to the Ramseys were turned over by them to White, the father of the female defendants; and that he occupied said land until his death in April, 1942. At the time of the deed to Ramsey the Lankfords, then the owners of the mill lot and the four-acre tract adjoining, were in actual possession and their possession thereof continued until October, 1937, when the title to said lot became vested in Johnston, under the deed from Gadd, Trustee. From that time on to the date of the institution of this suit, Johnston has been in actual and continuous possession of the mill lot. W. E. White is dead, but it is improbable that, if living, he could, with relation to the issue of possession during this period, have shown anything other than that the Lankfords and Johnston managed, possessed, and cultivated the land, and operated the mill located thereon. The evidence as to this possession is very strong. It may be that White was not, strictly speaking, the agent of the defendants; but inasmuch as he had initiated and carried through this transaction, and the land, as all the testimony indicates, was being bought for the benefit of himself and wife, it is inconceivable that he would have permitted the Lankfords and Johnston to have retained possession of this land during all of these years without some character of protest to them, and without communicating that protest to the owners of the land. We think this lack of protest on the part of White leads to the inevitable conclusion that White, at least, knew that it was not intended that the mill lot be sold. But the defendants, in attempting to explain the possession of the lot in question by the Lankfords and Johnston, say that if there was such possession they had no knowledge of the same until shortly before the institution of this suit, and not until after the deed to the Terrys was made on March 21, 1942. The Ramseys say that they purchased this land so that W. E. White and his wife might have a home; that they paid the purchase money notes, and paid the

taxes on the property; that they never have obtained any rents or profits therefrom, but turned the property over to White to use as he might desire; that they visited the White home as much as three or four times a year, and, of course, knew that the mill lot was in the possession of someone, was being cultivated and used, but assumed it was the possession of W. E. White, and made no inquiry about it; and that the matter of possession was never at any time mentioned. The testimony of the Terrys is to the same effect. They, too, say that they visited the White home, which was in sight of the property in controversy, and noted the possession, but assumed it was that of White, and likewise made no inquiry as to the nature thereof. On the basis of this testimony they maintain that even though Lankford and Johnston had possession of the land in question during all these years, that fact cannot now be charged against them.

We are unable to accept this contention. We think it inherently incredible that for five and one-half years this situation with respect to possession of this valuable property would have continued without the defendants having some knowledge, or being put upon inquiry, as to the nature thereof. In the first place it is quite improbable that if White believed that the mill lot had passed by the conveyance to the Ramseys, he would not have made some effort to obtain possession thereof. It is in evidence that the mill was operated by the Lankfords and Johnston successively until 1940. White had theretofore owned and operated the mill, and made a considerable part of his living therefrom, and it is inconceivable that he would not have insisted on possession of the mill if he had believed it had been intended to be conveyed, and likewise inconceivable that, in such circumstances, he would not have brought the matter to the attention of the owner.

Another point bearing upon this question of what was intended to be sold and purchased is that the mill on the lot of 7.73 acres would have been of no value without

the use of the water power, and this could only be obtained through some character of conduit from the milldam located on the 4-acre tract, no claim to which is made by the defendants. At the time of the deed of August 13, 1936, Lankford, was the owner of the 4-acre tract on which the milldam was located, and the 7.73 acres on which the mill was located; and, therefore, the mill property, including the dam, was in the hands of one person. Why anyone should make a division of the mill property, and convey the mill without access to the power, which made its operation possible, has not been explained.

There is, of course, a great deal of authority on the question of the effect of actual possession, as notice of fraud or mistake on the part of one claiming to be an innocent purchaser for value. This proposition bears upon the claim of the defendant, Floetta Terry. The rule is that "When a claim to protection as a *bona fide* purchaser for value and without notice is involved, the burden is on the party denying the validity of the purchase, to prove notice of his equity, and, upon the other party, to prove good faith and payment of an adequate consideration." *Lumber Co.* v. *Terry, Trustee,* 69 W. Va. 572, 73 S.E. 278. "He who avers that another purchased with notice of his superior right, has the burden of proving such notice, either actual or constructive; while such other must prove that he is a complete purchaser for a valuable consideration." *South Penn Oil Co.* v. *Blue Creek Development Co.,* 77 W. Va. 682, 88 S.E. 1029. All through the years the fact that a person is in actual possession of real estate has been considered as notice to a purchaser contracting with the claimant of such real estate, who is not in possession, such as to put him on inquiry; and if he takes a conveyance from such claimant, he will be charged in favor of the person in actual possession, with the information such inquiry would have given him had he diligently and reasonably pursued an investigation. This proposition is sustained by *Campbell* v. *Fetterman's Heirs,* 20 W. Va. 399; *Clark* v. *Braid-*

*en, supra; Smith* v. *Owens, supra; Preston* v. *West,* 69 W. Va. 24, 70 S.E. 853; *Mills* v. *McLanahan,* 70 W. Va. 288, 73 S.E. 927; *Stickley* v. *Thorn, supra; George* v. *Stansbury,* 90 W. Va. 593, 111 S.E. 598; *Page* v. *Westfield Pharmacy, Inc.,* 98 W. Va. 558, 128 S. E. 94. Therefore, if at any time before acquiring title to the land here in question the defendant, Floetta Terry, had notice of the possession of the 7.73 acres by the Lankfords or Johnston, it became her duty to make inquiry as to the basis and nature of such possession; and if without such inquiry, she acquired title to said land, she did so with notice of the rights of those in possession, which reasonable inquiry might have developed.

In addition to the effect of possession on the part of the Lankfords and Johnston, mentioned above, there is a further claim that at the time the defendant, Floetta Terry, acquired title to this land under her deed from the Ramseys, she knew of the claim of Johnston to the land in question. Here arises a dispute of fact. It is not disputed that some time in the late winter or early spring of 1942 the husband of Floetta Terry made inquiry of Johnston as to the price at which the 7.73 acres could be acquired. Johnston says that at a meeting on a highway near the land in question, the husband of Floetta Terry made this inquiry, stating at the time that he was on a deal with the Ramseys for the 200 acres of land, and he thought the mill lot ought to go with the 200-acre tract. Johnston's version of this conversation is corroborated by several witnesses, who say they heard the same, and all of them say it was in February, 1942. Johnston says the conversation occurred on the highway, and that Floetta Terry was in an automobile within a few feet of the point where the conversation occurred and she could have heard it. Terry does not dispute this conversation, but says that it was at a later date, and after his wife had taken a deed for the Ramsey property. He further says that the conversation occurred across the road from where his wife and her sister, Ozella Ramsey, were sitting in an automobile, and that they

could not have heard the conversation, nor could any other person have heard it. Terry says he made this inquiry in order to ascertain whether Johnston was claiming this land, but there is no indication in the testimony as to what information Terry then had as to the possibility of Johnston making claim to the land, or how he acquired that information. In one aspect of the case, the date when this conversation occurred is important. If it was not held until after Floetta Terry obtained her deed from the Ramseys, there is no clear testimony that she had knowledge of Johnston's claim to the land prior to the date she obtained her deed, and, as indicated above, we must depend on the circumstances of possession to hold her to such notice. In another aspect of the case, it is not so important if Floetta Terry be charged with notice of Johnston's possession before she obtained her deed, and failed to pursue the duty of inquiry which that notice entailed upon her. For reasons stated above, we think she was charged with the duty of making inquiry as to the possession on the part of Johnston, knowledge of which we think she must have had long prior to the date when she began negotiating for the purchase of the 200-acre tract of land. The inquiry was made by the husband of the defendant, Floetta Terry, who, we think, under the principle announced in *French* v. *McMillion*, 79 W.Va. 639, 91 S.E. 538, makes the acts of the husband in such a case chargeable to the wife. On the whole, we think the evidence clearly preponderates that the inquiry made of Johnston on the highway was made in February, 1942, and before the deed from the Ramseys to Floetta Terry, and, therefore, her claim to be a purchaser for value and without notice is not sustained.

Another consideration of some consequence is the fact that the two lots described as eight and four acres conveyed by Johnston to the Lankfords on July 29, 1936, was for a consideration of three thousand dollars. The conveyance made by Johnston to the Ramseys fifteen days later was for a consideration of twelve hundred fifty dollars. When the Ramseys sold to Floetta Terry

in 1942, it was for a consideration of eight hundred dollars. There is evidence that the 7.73 acres of land was perhaps equal in value to the residue of the two hundred acres, although there is some slight conflict on that point. It seems improbable that Floetta Terry believed she was acquiring the whole of the two hundred acres, including the 7.73 acres, for a consideration of eight hundred dollars, when the same property, and the four acres, had been sold a few years before for considerations aggregating forty-two hundred fifty dollars.

Another point which cannot be entirely ignored is the fact that the Ramseys made conveyance of the 200 acres without warranty, indicating that the Ramseys did not want to be responsible for any failure of title to any part of the 200 acres described in the deed of August 13, 1936.

The trial court held in favor of the plaintiffs and decreed that the deed of August 13, 1936, should be reformed by cancelling and declaring void the deed from Johnston and wife to W. B. Ramsey, Jr., and Ozella Ramsey, and decreed that the deed from W. B. Ramsey, Jr., and wife to Floetta Terry, dated March 21, 1942, in so far, and in so far only, as said deeds purport to convey a certain tract of land situate on East River in Mercer County, which had been conveyed to C. H. Lankford and Mamie Lankford, his wife, by deed dated July 29, 1936, and described in said deed as containing eight acres, more or less, and which is the same tract as the 7.73 acres herein mentioned. It is unnecessary to cite authority to sustain the proposition that a decree involving decisions by a circuit court on matters of fact is entitled to great weight, and will not be disturbed unless this Court believes the same to be in clear conflict with a preponderance of the evidence, or without evidence to support it. The legal questions involved in this cause are not difficult, but the questions of fact arising on the record are difficult, and decision thereof depends upon evidence and circumstances of a highly conflicting nature. We have come to the conclusion that we would

not be warranted in disturbing the findings of the trial court thereon.

We think it clear that plaintiffs did not intend to convey the tract of 7.73 acres to Ramsey and his wife, and that Ramsey and his wife knew they were not acquiring title to that land, and accepted delivery of the deed of August 13, 1936, to them with knowledge that the 7.73 acres had theretofore been conveyed to the Lankfords. In this situation there was a mutual mistake, for which equity will give relief. We are of the opinion that a mistake was made by the scrivener, who evidently did not realize that the description he used did not necessarily exclude the 7.73 acres. This may be attributed to the fact that, according to the proof and the map filed with the record, even if we exclude the 7.73 acres, the 200 acres still bordered on East River. We think that all of the parties left the preparation of the deed to the attorney, and that none realized the effect of that mistake at the time, and that it was not discovered until almost six years thereafter. We are of the opinion that the possession of the Lankfords and Johnston, clearly shown by the evidence, was of such nature that the defendants must have known thereof, and that fact put upon them the duty of making reasonable inquiry as to the nature and basis of that possession. If such inquiry had been made as to the basis of Johnston's possession, prior to the death of W. E. White, the whole matter might well have been explained and this litigation avoided. If there was a mutual mistake such as plaintiffs allege, and we think is established, then the fact that on the face of the deed Johnston actually conveyed the 7.73 acres to which he had no title at the time, his subsequently acquired title does not inure to the benefit of the defendants, or either of them, because any reformation of the deed must be held to relate to the date of such deed, and in legal effect there never was any conveyance of the 7.73 acres to which the estoppel theory could be applied. We are of the opinion that the possession of the Lankfords and Johnston, subsequent to the date of the deed to the

Ramseys, and to the date of the institution of this suit, was, in the circumstances, notice to each and all of the defendants, such as to put them on inquiry, and that the Terrys cannot be treated as innocent purchasers for value, even if we ignore, as unimportant, the direct evidence that the defendant Terry's husband was attempting to purchase the 7.73 acres from Johnston prior to the date she obtained a deed for the 200 acres from the Ramseys.

On the whole, we are of the opinion that the decree of the circuit court should be affirmed.

*Affirmed.*